# THE STATE v. HEZ RASCO, Appellant.

### Division Two, February 6, 1912.

1. **CHANGE OF VENUE: Prejudice of Inhabitants: Discretion of Judge.** Whether or not a change of venue will be granted because of the prejudice of the inhabitants of the county, is a question within the discretion of the trial judge, and his ruling will not be disturbed on appeal unless it becomes apparent that he had abused that discretion. Whether or not the prejudice exists is a question of fact to be determined by him, and he has the witnesses before him, and though there is evidence that the feeling of the people was aroused by the singularly atrocious murder, yet if, taken as a whole, it fails to indicate any widespread feeling of prejudice and animosity against defendant, it will not be held that the trial judge abused his discretion in denying to defendant a change of venue.

2. **CONTINUANCE: Removal of Defendant from County.** Where the court on December 15 appointed four attorneys to represent defendant, and the trial began January 30, it will not be held that it was error to deny defendant's application for a continuance alleging a lack of sufficient time for counsel to prepare for trial, said application being based on the removal of defendant to the jail of another county for one week between those dates, there being no showing by affidavit or otherwise that the time was insufficient for full preparation or that the rights of defendant were in any degree prejudiced by reason of his absence from the county.

3. **————: Examination of Gun and Blood Spots.** Where the gun and clothing were in another city at the time they were asked for by defendant's counsel; where no application was made to the court for an order upon the sheriff to produce and turn them over to the defendant's counsel for the purpose of expert examination; where defendant at the trial testified that the blood spots on the clothing were due to a bleeding at his own nose, and no attempt was made by the State to prove that there were any human blood spots on the gun; and where the record fails to show any purpose on the part of the State to prevent access to these articles by defendant's counsel or that counsel could not have obtained them at some time prior to the trial, upon proper demand, it will not be held that the court erred in refusing defendant's application for a continuance on the assigned ground that his counsel had been denied an opportunity to have the gun and clothing afterwards used in evi-

dence examined by experts to determine the presence and char-
acter of certain alleged bloodstains thereon.

4. ————: Subpoenaing Additional Witnesses: Matter of Right:
Application of Statute: Description. The right of the State
under the statute to call witnesses other than those whose
names are indorsed on the indictment or information, in the
absence of intentional deception on the part of the prosecuting
attorney, is unquestioned. Section 5385, Revised Statutes 1909,
providing for the filing of an affidavit and written order by
the prosecuting attorney for subpoenas for such witnesses, was
not enacted for the benefit of the accused, but solely with re-
gard to the question of costs. Counsel for defendant are not
entitled as a matter of law to know the names of such witnesses
when the subpoenas are issued, and, in the absence of an intent
on the part of the State to practice a deception, cannot complain
that they did not learn until the morning of the trial that such
witnesses had been subpoenaed. And where, by request of the
prosecuting attorney, subpoenas were issued on the 20th for wit-
nesses whose names were not indorsed on the information, and
on the 28th he filed his application and written order for such
subpoenas, and the clerk, at his request, dated the filing mark
thereon back to the 20th, and on the morning of the trial on the
30th, at his request, after conference with defendant's counsel,
the file mark was changed to the 28th, the actual day of filing,
and the prosecuting attorney testified that he had no intention
of deceiving defendant's counsel, but that he inadvertently
failed to file the written order on the 20th and when he did
file it had the date of the filing mark made to correspond to
the date on which the subpoenas were issued in order that there
might be no question as to the right of the witnesses to claim
their fees, and no claim was made at the trial by defendant's
counsel or in his application for a continuance that they were
deceived thereby, it will be held that there was no intentional
deception, and that the court did not err in refusing the con-
tinuance.

5. ————: Absent Witness: Diligence: Immaterial Testimony.
A subpoena issued for a witness eleven days prior to the day
for which the trial has six weeks previously been set does not
show sufficient diligence; and where the application states no
fact showing diligence, and no fact on which to base a belief
that the absent witness would ever return, and the facts it is
asserted the witness would testify if present, if true, are wholly
immaterial, the continuance should be denied.

6. JUROR: Opinion Formed: Fair Trial Nevertheless. A juror is
qualified notwithstanding he has formed an opinion of defend-
ant's guilt based upon rumor and newspaper reports, if he is
able to try the case fairly and impartially and render a verdict.

based upon the evidence alone, guided by the instructions of the court, and notwithstanding he has given contradictory answers as to his willingness to divest himself of his previously formed opinion. And whether or not he can try the case fairly and impartially, notwithstanding such previously formed opinion, is to be determined by the trial judge; and if the juror clearly states that he can try the case fairly and impartially, notwithstanding such previously formed opinions, and such opinions are not based upon facts elicited from any witness or other person who professed to know the facts, and the trial court, after a careful test, holds the juror qualified, the holding will not be reversed on appeal.

7. **EVIDENCE: Murder: Hearing Sounds Over Telephone.** A charge of shot had entered the head of deceased, and his body had been dragged into his house, and the house set on fire. The head of his wife had been crushed by a blow from a blunt instrument, her hands burned off, and around one arm was the telephone wire, and, lying near, was the telephone receiver; and near her body were found the burnt bones of her two children. Defendant's contention is, not that no crime was committed, but that he did not commit it. *Held,* that the testimony of a neighbor that, at about the time the crime was committed, she heard a signal given over the party-line telephone for the house of deceased's father, and that out of curiosity she took down the receiver of her own phone, and heard a jar or fall, and at the same time heard the voices of children exclaiming, "Oh mamma! mamma!" was competent, as a slight circumstance tending to show that the wife of deceased was assaulted and fell under the blows, although the State did not undertake to identify the sounds as coming from the house of deceased.

8. ————: **Possession of Money by Deceased: Motive.** Testimony that defendant knew, a few hours before the homicide, that deceased had on his person a large amount of money, is competent, as showing motive.

9. ————: **Bloodhounds: Admissible.** The actions of properly bred and trained bloodhounds, when set upon the trail of a human being, are competent evidence, as tending to show the direction and distances followed by such person along such trail, and the point where it ends; but before their acts are admitted, there should be a sufficient preliminary showing of the breeding, capacity, training and experience of the hounds.

10. ————: ————: **Obliteration of Tracks.** The fact that the bloodhounds were not brought to the scene of the murder until eighteen hours had elapsed, that in the meantime a great number

of visitors had gathered in and around that scene, and that the hounds were given their start by smelling at a heel mark, plainly impressed in the mud where deceased was apparently shot and seeming to be made by some one who dragged deceased into the house which was set on fire and where his body was largely consumed, affects the weight of such evidence, but not its competency.

11. ———: ———: **Taken Off of Trail and Started Again at Distant Point.** Nearly eighteen hours after the homicide, two bloodhounds were brought to the scene and put upon a heel mark near the pool of blood where deceased had been shot down, and from which his body was dragged into the near-by house, which was burned, his body being partly consumed. The heel print faced away from the house, was near the edge of the pool of blood, was sunk in the mud, and indicated that it was made by a person who was braced and was pulling towards the house. The mark indicated that the heel had three tacks or nails on each side and one in the middle, belonged to the right shoe, and that the inside corner was worn down. The dogs were put upon the scent of this heel mark, and, after some doubling back and forth in the vicinity, started upon the trail, which led in various directions through the fields and roads, and followed it for about two miles and a half, when they were taken off the trail and allowed to feed and rest. Immediately after being so fed they were taken in an automobile to a point near a railroad track, more than a mile away, and there were put out, and in a short time took up the scent and followed it to the house of defendant. Upon being admitted therein the dogs placed their paws against a door to a stairway leading to a chamber above, and, the door being opened, they proceeded up the stairs and into defendant's bedroom, smelled of a pair of overalls lying on the floor, upon which were found some spots subsequently declared to be human blood, and where there was also found a pair of shoes, the heel of one of which was appropriate to produce the mark from which the hounds took the scent. Defendant admitted he wore the overalls the night of the homicide. Other witnesses testified that they followed the trail taken by the dogs and found the same heel mark at various places along the route, both along that followed by the dogs, and along that between the point where they were fed and the point where they regained it. The master of the dogs testified that he had been training them for two years, that they were of pure breed, had had much experience in tracking human beings, with uniform success, and that their capacity was such that, after being once put upon a human trail, they would adhere to it until called off by him, and no matter how many other trails intervened, and no matter if they were taken off for a short time, they would not take up another trail, but would

adhere to the original trail until called off by him; and he also testified that he took the dogs in the automobile intending to make a detour to avoid the crowd and come back to the same point to renew the hunt, but that, while making this detour, he came to the railroad track, and there a suggestion from his experience came to him that a fugitive would be likely to take to the railroad track, and that when the dogs were set to work at that point, without any interference from him they took the trail that led to defendant's house. It was also shown that the hound-master did not know where defendant lived, and did not know that he was suspected of the crime. *Held*, that it is not for the court to determine the weight of these facts, but only their competency; and that the court cannot hold, as a matter of law, that it is utterly incredible that the dogs should be able, after the interval of time and distance, to pick up the same trail again, but the facts and the master's testimony are competent, but cautionary instructions as to their credibility should be given, as was properly done.

12. ————: **Other Crimes: One Transaction: Res Gestae: Later Examination at Undertaker's.** Deceased had been shot in the head and his wife's head had been crushed with a blow. He had been shot outside his residence, and there was evidence tending to show that she was inside standing at the telephone when the blow was given. His body had been placed in the house, and the house burned, and the bodies of both partly consumed, and those of their two children altogether so, except the large bones. *Held*, that there was but one transaction, and it was competent to show how the wife came to her death in the trial of defendant for murdering the husband, and to show, as a part of the *res gestae*, the condition of the bodies found in the ruins of the house, whether that condition appeared upon an examination at the ruins, or upon a subsequent examination made by physicians at the undertaker's shops to which the bodies were removed.

13. ————: **Shoes.** When it is shown that the shoes belonged to defendant, that they were found in his bedroom the next day after the homicide, and that the heels of one of them corresponded with the heel print found in the mud at the place of the homicide, such shoes are admissible in evidence, although it is not shown that defendant wore them on the day of the homicide.

14. ————: **Promised but not Produced: Bad Faith.** The mere fact that the prosecuting attorney in his opening statement stated to the jury that the State would prove that threats were made by defendant against deceased, and no proof of any such threats was made, will not support a charge of bad faith, or warrant a reversal.

15. **REMARKS OF COUNSEL: No Exception.** If no objection was made or exceptions saved to the sufficiency of the rebuke of the trial court to improper remarks of the prosecuting attorney, those remarks are not for consideration on appeal.

16. ————: **Calling Defendant Demon.** Where the facts in evidence make of the perpetrator of the crime a "demon and a monstrosity," the court cannot reverse the judgment because the prosecuting attorney in his argument to the jury applied those epithets to defendant, though their use is by no means approved.

17. **INSTRUCTION: Collateral Matter: Failure to Request.** The trial court is not required to instruct the jury concerning a collateral matter unless such instruction is specifically requested, even when such an instruction might be proper.

18. ————: **For Second Degree Murder.** Where all the facts point to deliberate, premeditated murder, it is not error to fail to instruct on murder of the second degree.

19. ————: **Covered by Those Given.** Refusal to give defendant's instructions on reasonable doubt, presumption of innocence, and burden of proof, correct in all respects, was not error, if their substance was fully covered by those given by the court.

20. **MISBEHAVIOR OF AUDIENCE: No Objection.** The misbehavior of the audience in the courtroom, in applauding at the close of a speech for the prosecution, if sternly rebuked by the court, who warns the jury to disregard it, and no objection is made by defendant's counsel, will not authorize a reversal.

21. **PREJUDICIAL JUROR: Ascertained During Trial: Waiver.** A statement in the motion for a new trial that the facts that one of the jurors was prejudiced and that he had said before the trial that "if I get on the jury I will hang the son-of-a-bitch" came to the knowledge of defendant "during the closing arguments of said cause," amount to a waiver of any objection to said juror, and precludes a reversal based upon his prejudice. He should, through his counsel, have brought the matter to the attention of the court before the case was submitted to the jury. He cannot be permitted to take his chance with the jury, and then, when its verdict is adverse to him, take advantage of the juror's prejudice.

22. ————: **Finding of Trial Judge.** Where the finding of the trial judge that the assignment in the motion for a new trial that a certain juror was prejudiced against defendant and had expressed a desire to convict him was not true, is fairly supported by the evidence, the appellate court will defer to his finding, and will not undertake to determine whether or not the evidence supports the assignment.

23. **JUDGMENTS: Reversal: Minor Errors.** Courts reverse judgments only for errors that go to the substantial rights of the parties. Minor errors creep into every long and protracted trial, but they are not grounds for reversal.

Appeal from Nodaway Circuit Court.—*Hon. Wm. C. Ellison*, Judge.

AFFIRMED.

*E. E. Williams* and *Ellis G. Cook* for appellant; *Crawford & Sayler* of counsel.

(1) The court erred in overruling defendant's application for a change of venue. State v. Goddard, 146 Mo. 181; State v. Streight, 138 S. W. 742. (2) The court erred in overruling defendant's motion for a continuance. State v. Warren, 94 Mo. 648; State v. Hesterly, 182 Mo. 16; State v. Neiderer, 94 Mo. 79; State v. Loe, 98 Mo. 613; State v. Berkley, 99 Mo. 41; State v. Maddox, 117 Mo. 667; State v. Martin, 230 Mo. 668; State v. Anderson, 96 Mo. 253. (3) The court erred in overruling defendant's challenges to jurors Hayes, Jones and Speer. Mahaney v. Railroad, 108 Mo. 191; State v. Foley, 144 Mo. 600; Theobald v. Hartman, 191 Mo. 416. (4) The court erred in permitting the prosecuting attorney to recite to the jury certain alleged facts and circumstances which were clearly incompetent, irrelevant and immaterial as evidence in the case. Kelly's Crim. Law (Ed. 1876), par. 343; State v. Kennedy, 177 Mo. 98. (5) The court erred in admitting incompetent, irrelevant and immaterial testimony over the objections and exceptions of defendant: 1st. As to deceased exhibiting at his home, in the absence of the defendant, on the 20th day of November, 1910, a large sum of money, it not being shown to the jury that the defendant had any knowledge thereof. 2nd. In permitting the State to go into detail and show the supposed cause of the death of Clara, Walton and Jessie Hubbell. Green

v. Com., 17 Ky. L. Rep. 940. 3rd. In permitting the coroner to give his opinion that the brains of the children were torn asunder because he did not find the skulls intact. 4th. In permitting the testimony of doctors as to the autopsy of the female body, which was held at Barnard. 5th. In permitting witnesses to testify whose names were not indorsed in the information, and no order or affidavit made by the prosecuting attorney at the time the subpoenae was issued, thus depriving the defendant of the right to meet such testimony. 6th. Conversations with the defendant by officers, not made against interest, not pertaining to the *res gestae,* and being no confession. State v. Jackson, 95 Mo. 624. 7th. In permitting the officers to give in detail conversations had with the defendant, as to his whereabouts, and in the State's case in chief to show that the statements made by the defendant were untrue, not having at the time any benefit of a statement by the defendant. 8th. In permitting witness Mrs. Wilson, to give in detail sounds heard over the telephone, without it being shown that the sounds came from the home of the deceased. State v. Vicker, 209 Mo. 31. 9th. In permitting any testimony as to the acts and doings of the bloodhounds. Brott v. State, 97 N. W. (Neb.) 593; Parker v. State, 46 Tex. Crim. 441; 3 Am. & Eng. Ann. Cases, 893; Pedigo v. State, 6 Ency. Ev. 931; Hargrave v. State, 147 Ala. 97; Richardson v. State, 145 Ala. 46; State v. Hodge, 98 Ala. 10; State v. Hall, 4 Ohio, 147. 10th. In permitting exhibits to be introduced in evidence without being properly identified, and after their condition had been changed since the officers took them into their possession. Wharton's Crim. Evidence (8 Ed.), sec. 767; State v. Buehler, 102 Mo. 208; State v. Goddard, 146 Mo. 184; People v. Hawes, 96 Cal. 648. (6) The court erred in failing and refusing to instruct on all the law applicable to the case at the close of all the evidence. State v. Crabtree, 111 Mo. 136; State v.

Maguire, 113 Mo. 670; State v. Nelson, 118 Mo. 124; State v. Taylor, 118 Mo. 153; State v. Palmberg, 199 Mo. 333; State v. Porter, 213 Mo. 59; State v. Bobbitt, 228 Mo. 271; State v. Kennedy, 177 Mo. 132; State v. Lackey, 230 Mo. 707; State v. Minor, 195 Mo. 597; State v. Hoag, 232 Mo. 308; State v. Harris, 232 Mo. 317. (7) The court erred in refusing to give instructions offered and requested by the defendant. Coffin v. United States, 156 U. S. 432; State v. Kennedy, 154 Mo. 268; State v. Howell, 117 Mo. 324; State v. Sharpless, 212 Mo. 204; State v. Bauerle, 145 Mo. 17. (8) The court erred in permitting the prosecuting attorney and associate counsel for the State to use abusive and unwarranted language toward the defendant and to apply vile and abusive epithets to the defendant in the course of their arguments to the jury, over the defendant's objections and exceptions. State v. Jackson, 95 Mo. 623; State v. Young, 99 Mo. 666; State v. Ulrich, 110 Mo. 350; State v. Fisher, 124 Mo. 460; State v. Bobbst, 131 Mo. 328; State v. Prendible, 165 Mo. 329; State v. Elmers, 115 Mo. 404. (9) The court erred in failing to properly rebuke the spectators in attendance on the trial for an outburst of applause during and at the close of assistant prosecuting attorney's argument to the jury. State v. Dusenberry, 112 Mo. 277; State v. Gartrell, 171 Mo. 469. (10) The court erred in overruling defendant's motion for a new trial. Particularly in the matter of bias of juror Norman, expressed before his selection as a juryman. State v. Ross, 29 Mo. 33; State v. Burnside, 37 Mo. 343; State v. Gonce, 37 Mo. 627; State v. Wyatt, 50 Mo. 309; State v. Taylor, 64 Mo. 358.

*Elliott W. Major,* Attorney-General, and *Campbell Cummings,* Assistant Attorney-General, for the State; *George Pat. Wright* and *Marshall E. Ford* of counsel.

(1) Change of venue. Unless the evidence of the prejudice of the inhabitants of the county against the appellant is of such a character as to indicate that the trial court abused its discretion in refusing a change of venue, the Supreme Court will not hold error was committed in denying it. State v. Sharp, 233 Mo. 282; State v. Barrington, 198 Mo. 85; State v. Clevenger, 156 Mo. 190; State v. Albright, 144 Mo. 638; State v. Tetlow, 136 Mo. 678; State v. Dyer, 139 Mo. 199; State v. Vickers, 209 Mo. 12. The evidence as to the change of venue was conflicting, and the court will not disturb the finding of the trial court. State v. May, 172 Mo. 643; State v. Tettaton, 159 Mo. 372; State v. Barrington, 198 Mo. 84. The alleged prejudice, as shown by appellant's own witnesses, was based on rumor and newspaper reports, and largely conditioned upon his being the perpetrator of the crime. This was not a disqualifying prejudice. State v. Hays, 78 Mo. 314; State v. Burns, 85 Mo. 47. On a motion for continuance, appellant's affidavit must show due diligence, and set out circumstances showing the materiality of the testimony sought. It is equally well established that matters of continuance rest largely within the discretion of the trial court, and the presumption is in favor of its ruling. State v. Cochran, 147 Mo. 504; State v. Kindred, 148 Mo. 281; State v. Olds, 217 Mo. 312; State v. Horn, 209 Mo. 461; State v. Crane, 202 Mo. 74; State v. Riney, 137 Mo. 102; State v. Tatlow, 136 Mo. 678; State v. Maddox, 117 Mo. 667; State v. Banks, 118 Mo. 117; State v. Pagels, 92 Mo. 307. An examination of the record will show that, though a little slow mentally, Hays was qualified, as he stated that unless the evidence proved the defendant guilty beyond a reasonable doubt, he would acquit him, regardless of his former opinion. State v. Cunningham, 100 Mo. 389; State

v. Brennan, 164 Mo. 507. The excusing of a juror is
a matter within the discretion of the court, and it will
not be disturbed where abuse is not shown. State v.
Taylor, 134 Mo. 109; Glasgow v. Railroad, 191 Mo.
347. (2) After the alleged improper remarks of the
prosecuting attorney in his opening statement as to
certain alleged threats, which the State subsequently
failed to prove, it is sufficient to state that there is no
such ground preserved in appellant's motion for new
trial, and, therefore, the same was not in this court
for review. State v. Lackey, 230 Mo. 707; State v.
Witherspoon, 231 Mo. 706; State v. Scott, 214 Mo. 261;
State v. McKee, 212 Mo. 149; State v. Brannan, 206
Mo. 636; State v. Grant, 144 Mo. 66; State v. Hultz,
106 Mo. 41; State v. Marshall, 36 Mo. 400. It is not
the practice of the court to rule on the admission or
exclusion of evidence at the time of the prosecuting
attorney's opening statement. State v. Casto, 231 Mo.
398. Moreover, counsel must request the court to rep-
rimand the prosecuting attorney, and must except to
the failure of the court to reprimand. State v. Souva,
234 Mo. 666. (3) As to the prosecuting attorney's re-
marks in his argument to the jury to avail appellant,
it was necessary for him to have requested the court
to rebuke State's counsel. This he did not do. State
v. Chenault, 212 Mo. 137; State v. Harvey, 214 Mo.
411; State v. McCarver, 194 Mo. 717; State v. Valle,
196 Mo. 29; State v. McMullen, 170 Mo. 632. He
must except to the failure of the trial court to comply
with his request to reprimand the prosecuting attor-
ney for his improper remarks. State v. Souva, 234
Mo. 566; State v. Harvey, 214 Mo. 411; State v. Dusen-
berry, 112 Mo. 293; State v. Howard, 118 Mo. 146;
State v. Kullman, 225 Mo. 632; State v. McMullen, 170
Mo. 632; State v. Murphy, 201 Mo. 696. (4) As to
the applause by a part of the audience as to the as-

sistant prosecuting attorney's remarks at the close of his argument, the court adequately rebuked the disturbers. State v. Gartrell, 171 Mo. 513; State v. Dusenberry, 112 Mo. 293. (5) Appellant complains in regard to the admission of testimony relative to the actions of two bloodhounds used in tracing appellant. The following is the complete list of such cases, so far as we can find, after diligent search: Hodge v. State, 98 Ala. 10; Simpson v. State, 111 Ala. 6; Little v. State, 145 Ala. 662, 39 So. 674; Richardson v. State, 145 Ala. 46, 41 So. 82; Hargrove v. State, 147 Ala. 97, 41 So. 972; Gallant v. State, 52 So. 739; Davis v. State, 46 Fla. 137; McClurg v. Brenton, 123 Ia. 368; State v. Adams, 85 Kan. 435; Pedigo v. Com., 103 Ky. 41; Denham v. Com., 119 Ky. 508; Sprouse v. Com., 116 S. W. 344; Spears v. State, 46 So. (Miss.) 166; State v. Moore, 129 N. C. 494; State v. Hunter, 143 N. C. 607; State v. Freeman, 146 N. C. 615; State v. Spivey, 65 S. E. (N. C.) 995; State v. Norman, 153 N. C. 591; Brote v. State, 70 Neb. 395; State v. Brooks, 9 West L. J. (Ohio) 115; State v. Hall, 3 Ohio N. P. 125; Baum v. State, 27 Ohio Cir. Ct. 569; State v. Dickerson, 77 Oh. St. 34; Parker v. State, 46 Tex. Cr. App. 461; 12 Cyc. 393; Underhill, Cr. Ev., p. 438, n. 5; 1 Wigmore, Ev., sec. 177. It will be, consequently, seen that appellant's point that the bloodhound testimony was not admissible under any circumstances, and particularly because they were taken off the trail, is not supported by authority. In those cases which mention a continuous trail, the court was referring to cases where the dogs lost or abandoned the trail and not where the men themselves took them off. In the case at bar, the fact that the dogs were able to pick up the same trail as shown by the peculiar heel print after being taken off and fed, was an added proof of their keenness and accuracy of scent.

FERRISS, P. J.—Upon an information charging murder in the first degree the defendant was convicted in the circuit court of Nodaway county, on February 9, 1911, of the murder of Oda Hubbell, and sentenced to the death penalty.

The deceased, Oda Hubbell, thirty years old, lived with his wife and two small children in a cottage about two miles distant from the town of Guilford, in Nodaway county. On Sunday evening, November 20, 1910, this cottage was burned, and with it the bodies of the deceased, his wife and two children. The children were nearly consumed, nothing being found save some of their bones. The deceased and wife were partly burned. He had been shot in the head, and the wife's head had been crushed by a blow.

The State gave in evidence tending to prove the following facts:

During Saturday night, November 19th, preceding the homicide, the deceased, the defendant and one Wallace were playing poker for money in a box car in Guilford. Wallace went home at midnight. Deceased and defendant continued the game until 6:30 Sunday morning, soon after which time they separated, deceased going to his home. On this occasion deceased exhibited to defendant a large roll of bills, amounting to three or four hundred dollars. Deceased spent a portion of Sunday visiting his father, who lived near by, exhibiting there the roll of bills and also a handful of silver money. That evening, at about 6:30 or 7 o'clock, two gunshots, in quick succession, were heard from the vicinity of the home of deceased, followed shortly after by two more, muffled in sound. Later, about 10 o'clock that Sunday night, neighbors saw the cottage in flames. Those first on the ground saw, through the window, the body of deceased lying inside the door, burning fiercely. Later, an empty coal oil jug was found near it. Outside, at one corner of the house, was a pool of blood, and in-

dications showing that a body had been dragged from thence into the house. Near the pool was found an empty shotgun shell. In the ruins of the house were found the remains of Mrs. Hubbell and the two chil dren. The hands of Mrs. Hubbell were burned off. Around one arm was the telephone wire, and, lying near, the telephone receiver. Her head had been crushed in by a blow from a blunt instrument. The back bones and some rib bones only of the children were found. A charge of shot had entered the head of the deceased and some of the shot and the wadding of the shell were extracted therefrom. No silver money was found.

The defendant, on the morning of that day, borrowed a gun from one Cayton, also some cartridges which corresponded exactly with the one found at the pool of blood. This gun was found a few days later in the hayloft at defendant's home, with some foreign substance dried upon the stock, which substance contained blood, but not shown to be human blood. On Sunday afternoon defendant was seen near the Hubbell home, and seeking to avoid observation. At the edge of the pool of blood alluded to was observed a heel print in the mud, made by the right heel of a shoe. The heel print faced away from the house, was sunk in the mud, and indicated, it was thought, that it was made by a person who was braced, and was pulling toward the house. This mark indicated that the heel had three tacks or nails on each side and one in the middle, also that the inside corner of the heel was worn down, and that it was the heel of the right shoe. The next day, Monday, about noon, two bloodhounds, in charge of their master, arrived, and were put upon the scent from this heel track. Proceeding from this heel mark the trail, although broken at one point, led the dogs to the home of defendant and into his bedroom, where was found a pair of his shoes. The heel of the right shoe corresponded to the heel

mark described above, being worn down at the corner, and showing the seven nails arranged as shown in the track. There was also found in the room a pair of overalls which the defendant admitted to the sheriff, as the latter testified, were worn by him on Sunday night. A chemical examination showed that certain spots on the overalls were human blood.

The defendant, testifying in his own behalf, admitted the card playing in the box car. His story is that on Sunday morning he borrowed the shotgun and shells from Cayton, went hunting, returned about eleven o'clock in the forenoon, sought to return the gun, knocked at Cayton's door, and, no one responding, he left the gun on the porch. The Caytons testify that they were at home at the time defendant claimed to have called, but heard no knock and saw no one, although the upper part of the door was of glass, and that they could have both seen and heard defendant had he been there. They found no gun on the porch. Defendant says that after this he went on the train, about noon, to Ravenwood, a town twelve or fifteen miles distant, and returned home about three o'clock on Monday morning, spending the interval in Ravenwood. He produced no substantial evidence to cor- roborate this story, and was contradicted in several particulars by witnesses for the State. He claimed that he went to Ravenwood to collect a poker debt from a man whom he failed to find, and waited about the station until he took the return train. He said that the blood found on the overalls came from his nose during the card game. He admitted former convictions for murder in the second degree and grand larceny. Other facts will appear in the opinion.

I. We will first consider the action of the trial court in overruling defendant's application for a change of venue. Forty witnesses were examined in open court, pro and con, upon this application, seven-

teen for the defendant and twenty-three for the State. Of the seventeen witnesses introduced by defendant twelve testified to the effect that the prevailing opinion in their respective communities was that the defendant was guilty. Three of these testified that many people had expressed themselves as being in favor of hanging the defendant without trial. Four witnesses, including the three last mentioned, testified that they had heard expressions of hostility towards the defendant. The testimony of the sheriff and his deputy, called by the defendant, was to the effect that, although a crowd of six or seven hundred persons had assembled in and about the courthouse at the time of defendant's preliminary hearing, no expressions were heard by them indicating hostility towards the defendant while he was being conducted through this crowd. Nearly all of these seventeen witnesses testified that the opinions which they had heard expressed as to defendant's guilt were largely based on newspaper accounts of the tragedy.

Of the twenty-three witnesses examined on behalf of the State, in opposition to the application for a change of venue, ten testified in substance that newspaper accounts of the tragedy caused much excitement at first, and perhaps a desire among the people that the guilty party should be punished, and that some believed the defendant to be guilty, basing their opinions on newspaper reports. Others testified that they had heard no expressions of belief that defendant was guilty, but that the general expression was that the reports pointed towards his guilt. One witness testified that he had heard some one express himself as believing defendant guilty. Another witness, who traveled much through the county, testified that the excitement caused by the published reports had considerably abated, that the general sentiment was that the guilty party ought to be punished, and that he had heard a number say that they thought

defendant guilty.  Very few of the witnesses knew the defendant.  No witness for either the State or the defendant testified that he had heard of any specific threats made against the defendant.  The newspaper accounts of the tragedy were put in evidence, and, naturally, were somewhat sensational in character, and no doubt aroused considerable excitement and some prejudice against the defendant.

The evidence, taken as a whole, fails to indicate any widespread feeling of prejudice or animosity against the defendant, but does indicate that much feeling was aroused by the crime and against its perpetrator.

The question whether a change of venue should be granted is one of fact to be determined by the trial judge, who has before him the witness and is enabled to weigh his testimony in the light of his general manner and character.  While there was evidence tending to show prejudice against the defendant, we think, as the trial court did, that the preponderance of the testimony is the other way.  The rule is firmly established in this State that the question as to whether a change of venue shall be granted, because of the prejudice of the inhabitants of the county, is within the discretion of the trial judge, and his ruling will not be disturbed unless it becomes apparent that that discretion is abused.  [State v. May, 172 Mo. 630; State v. Tettaton, 159 Mo. 354; State v. Barrington, 198 Mo. 23.]

II.  When the case was called for trial the defendant filed a motion for a continuance, based upon the following grounds: 1, That his counsel had not had sufficient time for preparation on account of the removal of defendant from Nodaway county to St. Joseph; 2, That counsel had been denied the right to examine certain clothing and a gun in possession of the State, and which were to be used in evidence; 3,

Because of the failure of the prosecuting attorney to file at the proper time an order and affidavit for subpoenas for witnesses other than those whose names were indorsed on the information; 4, Because of the absence of a material witness, one G. F. Denser.

We will consider these objections in their order.

1.   The information was filed December 15, 1910. On the same day the court appointed four lawyers to represent the defendant.   Between this time and the 30th of January following, when the trial began, the defendant was removed from Nodaway county and kept for some days—the number not given—in St. Joseph.   It appears, however, that the time could not have exceeded a week.   Defendant was returned to Nodaway county on December 28th, and remained there until the trial.   There is nothing shown in the record, by affidavit or otherwise, to indicate that the time was insufficient for full preparation, or that the rights of defendant were in any degree prejudiced by reason of his absence from the county.

2.   Defendant's counsel claim that they had been denied opportunity to have the clothing and gun used in evidence examined by experts to determine the presence and character of certain alleged bloodstains thereon.    It appears from the record, however, that the sheriff did not have the articles in his possession when they were asked for by defendant's counsel.   They were then in Kansas City, for what purpose it is not stated, but presumably for examination by experts. The record does not show a refusal by the officers of the State to permit an examination of these articles by defendant's counsel, but rather that they were not available at the time because of their being in Kansas City.   No application was made to the court for an order to produce and turn said articles over to the defendant.   Furthermore, the defendant stated on the witness stand that there was blood on the overalls

which he said came from an attack of nosebleed before
the time of the homicide. This was an admission of
the fact that there was human blood on the garment.
As to the gun found at defendant's home, it was not
attempted by the State to prove any human blood spots
thereon. The record fails to show any purpose on the
part of the State to prevent access to these articles
by defendant's counsel, nor that counsel could not
have obtained the articles at some time prior to the
trial upon proper demand.

3. There were indorsed on the information the
names of fourteen witnesses. Presumably the infor-
mation was based upon the testimony of those wit-
nesses, and presumably the State did its duty in in-
dorsing names of witnesses as provided by sections
5097 and 5057, Revised Statutes 1909. [State v. O'Day,
89 Mo. 559.] On January 20th, by request of the
prosecuting attorney, subpoenas were issued for a
number of witnesses other than those indorsed on the
information. On January 28th, the affidavit and or-
der for these subpoenas, as provided by section 5385,
Revised Statutes 1909, were filed by the prosecuting
attorney, and the clerk, at the request of the prosecu-
tor, dated the filing mark back to the 20th of January,
to correspond with the date on which the subpoenas
were in point of fact issued. Subsequently, on the
morning of January 30th, the date on which the cause
was set for trial, the file mark was changed by re-
quest of the prosecuting attorney, after conference
with counsel for defendant, to January 28th, the ac-
tual date of filing. Counsel for defendant claim in
their brief and argument that they were deceived by
this proceeding. They made no such claim at the trial,
nor in their application for a continuance, in which it
is claimed only that the defendant was entitled, as a
matter of right, to know the names of these additional
witnesses at the time the subpoenas were issued. There

is no basis in the record for the claim of deception, nor do we think the State was bound to give the names of such witnesses.  Said section 5385, providing for the filing of an affidavit and written order by the prosecuting attorney, was not enacted for the benefit of the accused, but solely with regard to the question of taxing costs.  It is found in the chapter entitled "Criminal Costs," which embraces that subject only. The filing of the order subsequently to the issue of the subpoenas was, perhaps, somewhat irregular, but it is not shown that defendant's legal rights were prejudiced thereby.  The right of the State under the statute to call witnesses other than those indorsed on the indictment or information, in the absence of intentional deception on the part of the prosecutor, is fully established under the decisions of this court. No authority, by statute or otherwise, is presented in support of the claim that the State must furnish the names of such witnesses to the defendant.

This subject is fully discussed in the case of State v. Barrington, 198 Mo. l. c. 71, where we say: "We know of no rule of law or practice which would require the prosecuting attorney, upon the discovery of additional witnesses and as to the materiality of their testimony, to notify the defendant of the names of such witnesses and as to what their testimony would be upon the trial."

It was not claimed by defendant's counsel at the trial, nor do we think the record indicates that the prosecuting attorney, in requesting the clerk to date back the filing mark of the written order to January 20th, had any intention to deceive defendant's counsel.  His explanation is that he had inadvertently omitted to file the order, and that he subsequently had the date of the filing of the order made to correspond with the date on which the subpoenas were issued in order that there might be no question as to

the right of the witnesses to claim their fees from the date of their actual summons. If counsel for defend- ant were not entitled as a matter of law to know the names of these witnesses when the subpoenas were issued, then, in the absence of an intent to practice a deception, they cannot complain because they did not learn until the morning of January 30th that these witnesses had been summoned. The affidavit for con- tinuance does not charge that the prosecutor prac- ticed any intentional deception, and any such inten- tion is negatived in express terms by the testimony of the prosecutor. The affidavit of defendant on this point fails to make any proper showing to support the claim of surprise. He does not claim that he expected to impeach or contradict these witnesses, nor does it appear anywhere in the record that earlier knowledge of the names of these witnesses could in any respect have benefited the defendant. [State v. Myers, 198 Mo. 225.] Inasmuch as we hold that the defendant was not entitled as a matter of right to know the names of the additional witnesses, this con- tention must be ruled against the defendant.

4. The application for a continuance states that the defense had been unable to secure the attendance of a witness, one G. F. Denser, who would, if present, testify that the defendant visited his store in the town of Guilford at about nine o'clock on the morning of November 20, 1910, and remainded there a short time. A subpoena was issued for this witness on January 19, 1911, and returned "not found." Defendant stated in his application that he believed that said Denser was away from his home in Guilford for a short time, and believed further that he would have returned by the next term of court. The application does not show any effort to ascertain the then whereabouts of the witness, nor does it state any facts on which to base his aforesaid belief that the witness would re-

turn, nor anything to show that it was likely that the witness would ever return. Defendant states that he has used due diligence to obtain this testimony, but states no facts even tending to show diligence. The only fact in this regard is that a subpoena had been issued for this witness on the nineteenth day of January, 1911, about ten days before the cause was set for trial. In a similar case it has been held that more time should be given for the service of a subpoena. On the face of the application, it was problematical whether the witness would ever return. [State v. Kindred, 148 Mo. 270.] Under the ruling in the case just cited, the issuing of the subpoena so late as January 19th was not due diligence. But aside from this question, the evidence of Denser, as set out in the application, was immaterial. The homicide was committed on the evening of November 20th, some time after six o'clock, about two and a half miles from the town of Guilford. The fact that the defendant was for a short time, about nine o'clock, on the morning of that day, in a store in Guilford, could have no relevancy to any material question in the case. The only purpose claimed for it was to show "the whereabouts" of defendant "on the day of the alleged murder." It is suggested that this testimony of Denser would tend to contradict the testimony of a witness for the State as to meeting defendant on the road that morning; but, as stated above, the question where he was at that time was not of material importance.

We think the application for a continuance was properly overruled. It may be remarked in this connection that on December 22d, the day when the court order the trial to be set for January 30th, counsel for the defense gave notice in open court that they would on January 30th apply for a continuance. This notice was given before counsel knew or could have

known of the existence of the main grounds set forth in the application filed January 30th.

III. The defendant challenged certain jurors upon their examination on the ground of prejudice. These were jurors Hays, Jones, Speer, Worl and Wood. It is observed that the record fails to show any proper objection to said jurors, unless perhaps in the case of Hays. But aside from this question, we think that, even if proper objection had been made, the court would have committed no error in overruling same. These jurors were objected to on the ground that they had formed and expressed an opinion as to the guilt or innocence of the defendant. It will be unnecessary to set out in detail the very voluminous examination of these jurors. It is sufficient to say that they were examined at great length both by counsel for the State and the defendant, and also by the court. Particular objection is made to jurors Hays and Speer. The examination of Hays may be taken as a sufficient example, he being the one against whom objection is chiefly lodged. This juror, on direct examination by the State, testified that he was thirty-nine years old, a farmer, married, and had a family. He had read accounts of the homicide in the newspapers, had talked about it with neighbors, and stated that from what he had read and heard talked he had formed and expressed an opinion as to the guilt or innocence of the defendant, and "had that opinion now." He believed that he could, notwithstanding his impression, render a fair and impartial verdict under the evidence and the instructions of the court. The question was asked: "Will you promise me that you can do that, and will do it?" A. "I do." On cross-examination, he testified that he was a member of the Methodist church and of two fraternal orders, had formed and expressed an opinion from what he had read in the newspapers

and heard in his neighborhood, had such opinion still, and that it would require some evidence to remove it. When asked whether he could render a fair and impartial verdict, notwithstanding the fact that it would require some evidence on the part of the defendant to establish his innocence, he replied that he could, and furthermore, that he did not believe that his knowledge of any former conviction of the defendant would have anything to do with influencing his verdict; but he thought that this knowledge had something to do with his present opinion, and that it would require some evidence to change that opinion. He was then interrogated by the court as follows:

"Q. Have you such an opinion now on the merits of this case as would cause you to act against the defendant without hearing any further testimony? A. No.

"Q. Could you sit here in the trial of this case, hear all the evidence, and then render a verdict, under that evidence and the guidance of the instructions, wholly uninfluenced by anything you now know? A. I think I could."

There then follow some answers to various questions, and which in some respects appear to be contradictory. The following occurred upon the juror's further examination by defendant's counsel:

"Q. It would take some evidence on defendant's part to change that opinion; that is, the opinion you have, but not a fixed opinion? A. Yes.

"Q. You are open to conviction, to change? A. Yes, sir.

"Q. But it would, as you stand at the present time, require evidence on the part of the defendant to change the opinion you now have, if you had to render a decision at the present time? A. Yes, sir.

"Q. And from the knowledge and opinion you now have, if you were called upon to render an opin-

ion at the present time, you could not render a ver-
dict of not guilty? A. I don't believe I could.

"By the Court: You have just answered me that
you wouldn't render a verdict of guilty. Which do
you mean?—he has asked you, and you answered one
way to him and another way to me. A. It was a mis-
understanding on my part, then.

"By the Court: Well, I was satisfied of that.
Now, I will ask you again: Notwithstanding any opin-
ion you may now have, do you mean to say that you
could render a verdict of guilty, or against this de-
fendant, unless the evidence produced here by the
State showed him guilty beyond a reasonable doubt?
Could you render a verdict of guilty unless the State's
evidence showed him guilty beyond a reasonable
doubt? A. O no, no; I don't think I could.

"By the Court: You are certain of that, are you?
A. Yes, sir.

"By the Court: Then you could not, as you an-
swered to this question—you could not sit here and
render a verdict of guilty unless there was some fur-
ther evidence in here to show that he wasn't guilty?
A. No, sir.

"By the Court: You don't mean to say that at
all. What do you mean? He asked you if you could
render a verdict here of guilty, or would you render
a verdict of guilty, and feel that you ought to render
a verdict of guilty, unless he showed by some testi-
mony here that he was innocent; and I understood you
to answer him, 'yes, he would have to show by some
testimony that he was innocent.' A. Well, I believe he
would have to show by some testimony that he was
innocent."

"Counsel for defendant: Well, I move that the
juror be excused.

"By the Court: So would I rule if I had the re-
motest idea that the witness understood what he was

answering, and intended to convey the meaning that he does by his answer.

"Counsel for defendant: Well, he has gone over it pretty thoroughly with both the court and myself.

"By the Court: No. His answer to your question and mine are so contradictory that they cannot both stand, and it is perfectly evident that the witness is sincere, and don't understand."

The objection was removed, and the court examined the juror further, as follows:

"By the Court: I understood you to answer me that you would not be willing to find the defendant guilty of any offense on the knowledge that you now have, and would not do it unless the State produced some evidence that showed he was guilty beyond a reasonable doubt to your mind, under the instructions of the court. Did you answer that way? A. Yes, sir.

"By the Court: Then, why did you answer the Judge [defendant's counsel] that before you would render a verdict of not guilty the defendant would have to show that he was innocent? A. I would be impartial either way.

"By the Court: But suppose that the instructions of the court told you that the defendant was not bound to prove his innocence, but the State was bound to prove him guilty? A. They would have to prove him guilty, then, I guess.

"By the Court: Well, would you be willing to render a verdict against anybody unless he proved himself innocent? A. Well, he would have to be proved guilty, I guess, before I could render a verdict.

"By the Court: How? A. I guess he would have to be proved guilty before—

"By the Court: Before you would render a verdict? A. Yes, sir; that is the way I feel about it.

"By the Court: That is what you mean, is it? A. Yes, sir.

"By the Court: That you could not render a verdict of guilty until there was evidence that satisfied your mind that he was guilty beyond a reasonable doubt? A. Yes, sir.

"By the Court: Now, the question is, in making up your mind on the question as to whether he was guilty, could you pass upon that question governed entirely and exclusively by the evidence as you hear it, and the instructions of the court, and entirely uninfluenced by anything you now know? Could you do that? A. Yes, sir; I think I could."

The statute provides that a juror may be sworn, although he has formed an opinion, if such opinion be based merely on rumor or newspaper reports, and be such as not to prejudice or bias his mind. "A juror who states on his examination that he has formed and expressed an opinion as to the guilt or innocence of the accused, and that that opinion has been formed from rumor or newspaper reports, and that it would require evidence to remove the opinion, is not an incompetent juror; provided it shall appear to the satisfaction of the court that such opinion will readily yield to the evidence in the case and that the juror will determine the issues upon the evidence adduced in court, free from bias." [State v. Cunningham, 100 Mo 382.]

In the case just cited a juror testified that he had bias and prejudice in his mind, and that the defendant would have to prove that he was innocent. But, upon being examined by the court, he stated that his prejudice would not prevent him from giving the defendant a fair trial. He was held competent.

Whether a juror is competent is a question of fact to be determined by the trial judge, who has the advantage of seeing the juror and hearing him testify. It is quite natural that men, unaccustomed to courtrooms,

and to the technical and, sometimes, confusing questions of lawyers, should give contradictory answers. The testimony must be considered as a whole. Under the statute, a juror is qualified, notwithstanding an opinion based on rumor and newspaper reports, if he is able to try the case fairly and impartially upon the evidence and the instructions of the court. Whether he can do so is a matter to be determined by the trial court upon the examination of the juror. While the testimony of the juror, set out above, as well as that of other jurors objected to, indicates that he and they had opinions, still it also appears that these opinions were not based upon facts elicited from any witness or other person who professed to know the facts, but were based on rumor and newspaper reports. The jurors clearly stated that, notwithstanding such opinions, they could try the case fairly and impartially. Their answers as a whole, weighed in the light of their demeanor while testifying, satisfied the trial court that they were qualified under the statute to give the defendant a fair trial. We cannot say that the court erred in so ruling. This question is discussed fully in State v. Cunningham, supra; State v. Sykes, 191 Mo. 62; State v. Taylor, 134 Mo. 109, and many other decisions rendered by this court.

IV. Objection is made to the testimony of Mrs. Wilson as to certain sounds heard by her over the telephone at or about the time of the homicide. The witness testified that she was a neighbor, and that about 6:30 o'clock that evening she heard a signal given on the telephone which indicated a call for the house of Mr. Hubbell, father of the deceased, whose 'phone and also that of Oda Hubbell were on the same line with hers, and that out of curiosity she took down the receiver and heard a "jar" or fall, and at the same time heard voices of children exclaiming "O mamma, mamma!" The State did not undertake to identify

these sounds as coming from the house of the deceased. It appears that all telephones on a party line can at the same time receive a communication to any one. The theory of the State is, that the wife of the deceased, after the killing of her husband, went to the telephone and called up the house of her husband's father, and that while she was at the telephone she was struck down, that the "jar" which the witness testified to hearing over the telephone was occasioned by her fall and that the exclamations came from her children. It appeared in evidence that the body of Mrs. Hubbell was in such position and relation to the telephone wire and receiver as to indicate that she was at the telephone when she fell. The witness does not undertake to say that she could tell by the sounds themselves where they came from; but, considered with other evidence in the case, we cannot but regard this as a slight circumstance tending to show that Mrs. Hubbell was assaulted and fell under the blows. There is evidence tending to prove that about this time shots were heard, the sounds coming from the direction of deceased's house; also evidence tending to show that about this time Mrs. Hubbell was at the telephone, and that her body was found near the telephone receiver, with some of the wires around her arm. It would be quite natural that in her fright, after the shooting of her husband, she should rush to the telephone and attempt to call up his father's house. So that, although this evidence is of very little weight, we cannot say, under all the circumstances in evidence, that this is not a circumstance compëtent to be considered. But beyond this, even if it were wholly incompetent, its reception could not amount to reversible error. There is no question in this case but that the crime was committed. Defendant does not contend otherwise. His contention is that he did not commit the crime. There is nothing in the testimony under

consideration which in the slightest degree tends to connect the defendant with the crime, and it could in no way affect or prejudice the jury upon any material question in the case.

V. Objection is made to the testimony which showed that the deceased had on his person a large sum of money on the day of the homicide. We think this evidence was competent. The testimony showed that the defendant and deceased were engaged in a game of cards the night before the killing, and that on the morning of November 20th, the day of the homicide, deceased exhibited in the presence of defendant a large roll of bills amounting to three or four hundred dollars. In view of the testimony that defendant knew on that morning of the possession of this money by the deceased, we think the testimony objected to was competent, as tending to show motive. There was also testimony that deceased had a large amount of silver money on his person that afternoon, none of which was found on his body or around the premises of the deceased after the fire.

VI. On the day following the homicide, shortly before noon, two bloodhounds were brought to the scene and put upon a trail starting from the heel mark near the pool of blood, testified to by witnesses, and where, it was assumed, the deceased had been shot down, and from whence he was dragged into the house. The position of the heel mark indicated to the witnesses that the impression was made by a person while in the attitude of starting to pull the body towards the house. The dogs were put upon the scent of this heel mark, and, after some doubling back and forth in the vicinity, started on the trail, which led in various directions through the fields and roads, but generally eastwardly, for about two and a half miles, when they were taken off the trail and allowed to feed

and rest. Immediately after so feeding they were taken in an automobile across to another point near the railroad track, where their keeper who had them in charge thought, from his experience in trailing criminals with these dogs, the trail of the person sought for would likely be found. Putting the hounds out near the railroad track, they in a short time took up the scent and followed it to the house of the defendant. Upon being admitted therein, the dogs placed their paws against the door to a stairway leading to a chamber above, and, the door being opened, the dogs proceeded up the stairs and into defendant's bedroom, smelled of a pair of overalls lying on the floor, and upon which were found some spots subsequently declared to be human blood, and where there was also found a pair of shoes, the heel of one of which, as witnesses testified, was appropriate to produce the mark from which the hounds took the scent. The path taken by the hounds was sought to be verified or corroborated by the State by the evidence of witnesses who testified that they found the same heel mark along the route taken by the hounds, together with well-defined footprints, and that they also found this same heel mark and similar footprints leading from the point at which the hounds were taken off the trail to the point where they regained it, and from thence along the trail to the home of defendant.

Strenuous objection was made to the admission of this testimony on various grounds. It was claimed by defendant that the hounds were not shown to be sufficiently qualified to take up and continue a human trail; also that the condition of the premises was such, on account of the numerous visitors there before the advent of the hounds, as to obliterate and destroy the scent of any particular trail. Preliminary to the admission of the testimony the court, in the absence of the jury, took testimony bearing on the qualification

of the dogs to follow a human trail under such circumstances as existed in this case. The testimony of the keeper of the dogs was that he had been training the dogs for two years; that they were pure bred, and had had much experience in tracking human beings, with uniform success; that their capacity was such that, after being once put upon a particular trail, they would adhere to it until called off by him, and that no matter how many other trails might intervene, and no matter if the dogs were taken off for a short period of time, they would not take up any other trail, but would adhere to the original one until called off by him. The evidence on this subject was taken at great length, the court ruling that it was sufficient to admit the testimony, whereupon the keeper was allowed to testify before the jury, repeating his testimony as to their qualifications and experience, and reciting the acts of the dogs and the results of their trailing. The corroborating testimony of the sheriff and others who were with the keeper, either part or all the time, was also taken.

It is now urged upon the court that testimony of this character is so unreliable that it should not have been admitted in any event, and further, that the preliminary testimony was not sufficient to show the hounds were qualified. We have examined this question with a good deal of attention, both as to the facts in evidence and as to the law. It is a novel question in this State, but has been the subject of adjudication in other jurisdictions. The Supreme Court of Nebraska has ruled against the admission of evidence of the character in question, on the ground that it is intrinsically unreliable. [Brott v. State, 70 Neb. 395.] In our judgment, what is said in that case goes to the weight rather than to the competency of the evidence. It is a fact beyond controversy that dogs, in common with many others of the lower animal species, possess

a sense of smell developed to a degree which is almost beyond our comprehension. In many cases this sense of smell is their chief protection against enemies. Hunters fully appreciate this fact in attempting to approach wild game. It is a fact also, abundantly demonstrated, that dogs can and have followed with accuracy unseen, blind and intricate trails, guided only by the sense of smell. It has been further demonstrated that pure-bred bloodhounds possess in high degree the power to follow the trail of a human being over long distances. Measured by the usual standards applied to the admissibility of testimony, we must concede that the actions of a properly bred and trained bloodhound, when set upon the trail of a human being, are competent evidence, as tending to show the direction and distance followed by such person along such trail, and the point where it ends. We cannot demand absolute assurance of the impossibility of error as a test for the reception of testimony. We must depend largely upon the law of probabilities. The courts of many States, including Alabama, Florida, Iowa, Kansas, Kentucky, North Carolina, Ohio and Texas, have ruled such evidence admissible, upon a sufficient preliminary showing being made as to the breeding, capacity, training and experience of the hounds. Aside from the Nebraska case above referred to, the decisions are practically unanimous for the admission of the testimony. There is not an important feature presented in the case at bar that has not been ruled upon in one or more of these decisions.

It is strongly urged by the defendant that the great number of visitors upon the premises must have so confused and obliterated the footprints as to make it highly improbable that the hounds could pick up and follow any particular trail; also, that after so long a time (some sixteen or eighteen hours intervening between the killing and the arrival of the hounds),

the scent would have become seriously impaired or lost altogether.

In the case of State v. Dickerson, 77 Ohio St. 34, the hounds arrived the day after the body of deceased was found, and in the meantime "very many people, old and young, had trodden upon and over this scene." The court ruled that these facts went to the weight of the testimony only. The Dickerson case treats of the question of admissibility of bloodhound evidence very exhaustively and discusses at length the cases theretofore decided, and deduces from their consideration the following rule:

"We think that from a comparison of the views expressed by the different courts from whom we have quoted, there may be deduced a rule which, until shown untrustworthy, may be followed in cases where this class of evidence is offered. It is apparent that, before the acts and conduct of the dog can be shown, a proper preliminary foundation must be laid, and to establish such foundation it must be shown that the particular dog used was trained and tested in tracking human beings, and by experience had been found reliable in such cases, that the dog so trained was laid on the trail, whether it was visible or invisible, at a point where the circumstances tended clearly to show that the guilty party had been, or upon a track which the circumstances indicated to have been made by him. In addition to this the reliability of the dog must be proved by a person or persons having personal knowledge thereof. This foundation may be strengthened by proof of pedigree, purity of blood, or the exalted standing of his breed in the performance of such peculiar work."

In the case of State v. Adams, 85 Kan. 435, the shooting was from fifteen to eighteen hours before the dogs arrived.

The main objection lodged against the testimony is that the dogs were taken off the trail, fed, and then taken to a point a considerable distance away, where they picked up and followed a trail which led to the home of the defendant. The hound-master testified that, from his knowledge of and experience with the dogs, he was sure this was a continuation of the original trail. The trail taken by the dogs the second time led them to the home of the defendant, up the stairs and into his bedroom, where was found a pair of overalls which, it was testified, he admitted he was wearing on the night of the killing, and which were bloodstained; also a pair of shoes, the heel of one of which would fit the heel mark from which the dogs started. This same heel mark, it was testified, was found at intervals along the trail followed by the dogs, and even in tracks leading from the point where the dogs were taken off the trail to the point where they started the second time, and also along the trail which led to defendant's home.

In the Adams case, last cited above, the dogs at one point lost the trail. The court says: "It is evident that if the dogs started on the right trail, they soon lost it, but it seems that the master was confident that they caught it again and followed it to the Huntington house." And the court adds: "While this evidence was quite uncertain as to the character and still more uncertain as to the value, it was something which under proper instructions might properly go to the jury for such weight and credence as they thought it entitled to."

In Mississippi (Spears v. State, 92 Miss. 613), evidence of trained bloodhounds was admitted, and there, as here, "a track was found along the way leading to the house which corresponded to a shoe shown to have been worn at certain times by the defendant."

The State's case does not depend alone on the bloodhound evidence. There is ample evidence in the record, aside from this testimony, to connect the defendant with the crime. The evidence objected to is slight perhaps in weight, but competent to be considered together with all the facts in evidence.

The language of the Supreme Court of Alabama, applied to facts quite similar, is apt in this regard. The court says: "It is common knowledge that dogs may be trained to follow the tracks of a human being with considerable certainty and accuracy. The evidence in this case showed that a dog thus trained was within a very short time after the homicide put upon the tracks of the person toward whom all the circumstances strongly pointed as the guilty agent, and that the dog, as if following these tracks or 'trailing,' went to the house of the defendant. It was also in evidence, by several witnesses, that the tracks found at the scene of the homicide were followed by them thence to the house of the defendant, being measured at various points along the route, and otherwise, at each of such points, identified as being made by the same shoes as were the tracks at the place of the murder; and that the route thus traced by them was precisely that taken by the dog throughout. On this state of the case, we are of the opinion that the fact that the dog, trained to track men as shown in the testimony, was put on the tracks at the scene of the homicide, and, 'taking the trial,' so to speak, went thence to defendant's house where he, the defendant, is shown to have been that night after the killing, was competent to go to the jury for consideration by them, in connection with all the other evidence, as a circumstance tending to connect the defendant with the crime; and, of consequence, that the court committed no error in refusing to exclude it." [Hodge v. State, 98 Ala. 10.]

The master of the hounds testified that he took the dogs in the automobile, intending to make a detour to avoid the crowd and come back to the same point to renew the hunt; that while making this detour they came to the railroad track, and that his experience suggested to him the idea that the fugitive would be likely to take to the railroad track; that he decided to try the dogs at this point, and that they were set to work, and shortly, without any interference from him, struck a trail which led them to the home of defendant. It is claimed by defendant that it is incredible that the dogs should he able, after this interval of time and distance, to certainly pick up the same trail from which they had been taken at a point more than a mile distant. If the dogs could do this it is certainly astonishing, and may well tax our credulity; but, let us see—we are now dealing with the competency, not the weight, of the testimony. The master of the hounds testified that he was certain that the dogs, after once starting on a trail, would not take up any other trail until he called them off and started them on a new trail; that, unless he so intervened, the dogs would follow the same trail, if they found it, at a different place, no matter how far distant, and in the meantime would take up no other trail if left free; that, for illustration, if the dogs trailed a man to the cars, and that man should go on the train to a distant city, and the dogs should be taken to the station in such city where the man alighted from the train, they would, if left free, pick up the same trail. The witness testified that when the dogs were taken from the automobile they were left free and picked up a trail and followed it to the house of defendant. It was further shown that the hound-master did not know where the defendant lived, and did not know that he was suspected of the crime. The witness fortified his testimony as to the capacity of the hounds in this regard

by relating numerous instances within his knowledge where these same dogs had exhibited this remarkable faculty of following the same trail. If what the witness said was true as to the trained instinct, experience and capacity of the dogs, the evidence was competent. Whether his testimony was worthy of belief was a question for the jury. We cannot say that it is impossible that the dogs should be able to recognize the trail at a distant point. Whether they did so in this case was a question of fact to be submitted to the jury under proper instructions. Furthermore, it must be recognized that if it be true that the trail leading from the pool of blood, and which the dogs followed, was marked by the same footprints as that which led the dogs to defendant's bedroom, then the fact that the second trail led to the defendant's home strongly sustains the theory of the hound-master as to the power of the dogs to identify and pick up the trail at a distant point. All of the testimony, qualifying the dogs, detailing their actions along the trail, together with the corroborating circumstances of footprints and heel marks, was placed before the jury in great detail, under vigorous and able cross-examination by counsel for defendant and the court.

The instructions given by the court fairly present the law on this point. They are clear, and fully caution the jury as to the weight to be given to this evidence. They are as follows:

"8. The court instructs the jury that the evidence in the case relating to the work of the dogs should be cautiously weighed with discriminating judgment, and unless they believe from the facts and circumstances in the case, beyond a reasonable doubt, that the alleged trail at the place where the dogs finally ceased their work, was connected with and pointed to the defendant as the person who made it, then all evidence in relation to such work and to the alleged

trail, should be rejected and entirely disregarded. And unless the jury believe from the evidence beyond a reasonable doubt that the alleged trail, at the point where the dogs were laid onto it, and the alleged trail, at the point where they finally quit their work, had been made by a human being who was one and the same person, then all evidence in relation thereto should be rejected and ignored by the jury. And unless it clearly appears from the testimony that by the breeding, nature, training and experience of the dogs, when they are removed for an hour or so from a trail of some person or thing which they had been pursuing, they will not, on resuming work at a distant place, voluntarily pursue the trail or scent of any other person or thing, then their work under such conditions would be of no evidential value; and in this case, if the evidence does not show the dogs possessed such qualities, and yet did their work in such manner, then the jury must eliminate from their consideration all evidence relating to the dogs or their work.

"9. But if the jury believe from the evidence, beyond a reasonable doubt, that the dogs, by their nature, prior training and experience were capable of tracking or trailing a human being without aid or suggestion in the progress of their work, and that unaided they did so, in the surroundings disclosed by the evidence in this case, and if they further believe from the evidence that the dogs possessed the power to, and in their work aforesaid, did discriminate between the alleged trail on which they first had been laid, and the trail, track or scent (if any) of any other person or thing which came within their range during the progress of their work, and did pursue from the beginning to the final close of their work, a trail, or trails made by one and the same person, and no other, if made by a person; and if the jury believe from the evidence, beyond a reasonable doubt, that the immediate sur-

roundings and conditions existing at the time and place when and where the dogs finally terminated their work, as shown by the testimony, clearly pointed to the defendant as the person who had made the trail (if any), then the jury may consider the work of the dogs as a circumstance in the case, provided they further believe from the testimony that the alleged trail in its origin was made at the time the alleged homicide was committed by the person who committed it.''

One other objection to this evidence remains to be noticed. It is urged that the testimony did not sufficiently qualify the bloodhounds. We think it did. The evidence tended to show that they were of pure breed, that they had been successfully trained to track human beings, and that they had in numerous instances, during two years' experience, demonstrated their ability and fidelity in following a human trail.

VII. Objection is made to the admission of certain testimony given by doctors, particularly of facts found at the post-mortem held upon the body of Mrs. Hubbell. It is conceded by defendant in the brief of his counsel that the fact that three bodies were found in the ruins was proper to be shown as part of the *res gestae*.

Witnesses detailed, without objection, the position and appearance of the remains of the bodies in the ruins, stating to what extent they were burnt and charred, and that the remains of Mrs. Hubbell and the two children were taken to an undertaking establishment and examined.

When Dr. D. A. Pollard was asked concerning the body of Mrs. Hubbell, counsel for defendant said: ''We object to the examination of the female body.''

''By the Court: Why?

''Counsel for Defendant: Why, it is no part of this—

"By the Court: Objection overruled."

No further objection was made with regard to the examination of this body, and the doctor testified that they found a concussion, or rather a "cave-in on one side of the skull," which was caused by a blow from a blunt instrument, which blow, in his opinion, was the cause of her death.

The objection, as made, does not state any grounds therefor, and for that reason, it is claimed, might properly be overruled. It may be said, however, that the court, in the excerpt given above, summarily cut off counsel for the defense, who was attempting to formulate his objection. If, however, we consider the objection as properly made, we think the court committed no error in its ruling. It was competent, as part of the *res gestae,* to show the condition of the bodies found in the ruins. Whether that condition appeared upon an examination at the ruins, or upon a subsequent examination at the undertaker's, is unimportant. We also think it was competent to show how Mrs. Hubbell came to her death. What took place at that house that night was one transaction, occurring at the same time, and unquestionably caused by the same person. All facts and circumstances which in any proper degree bore upon the charge in the information on trial were competent, not because they show that other crimes were committed, but because they were related to the killing of Oda Hubbell, and they thus became competent notwithstanding the fact that they tended to prove other crimes. [Wharton on Crim. Ev. (9 Ed.), sec. 48; Underhill on Ev., sec. 58; People v. Molineux, 168 N. Y. 293; State v. Bailey, 190 Mo. 257; State v. Hyde, 234 Mo. 200; State v. Mathews, 98 Mo. 125.] It will not be seriously questioned but that the death of the four persons and the burning of the house were the act of the person who killed Oda Hubbell. If, in connection with the

killing of Oda Hubbell, the murderer also killed Mrs. Hubbell, that fact is competent, not only as part of the *res gestae*, but as bearing on the question of deliberation. The burning of the house and the attempted destruction of all the persons-therein would be competent as tending to show efforts to conceal evidence of the killing of Oda Hubbell.

Dr. J. A. Larrabee testified that, in his opinion, from the examination made, Mrs. Hubbell was killed by being struck with some blunt instrument. No objection was made to this testimony.

Dr. M. M. Pollard also testified to the examination of the body of Mrs. Hubbell, and the finding of the fracture of her skull caused by a blow with a blunt instrument, and this without objection. When asked to state his opinion as to the cause of her death, a proper objection was made by defendant. That objection was overruled. What we have already said justifies this ruling of the court.

Dr. J. H. Todd testified concerning the remains of the bodies found in the ruins, corroborating the statements of the other physicians as to finding the skull of Mrs. Hubbell crushed in, and also their opinions that the blow which crushed the skull caused her death. The doctor then testified that he found no remains of the children excepting portions of the bones of the bodies. He testified further that the brain does not readily yield to fire; that it seems to incrust, and that the internal portion remains intact if the brain is left in the body. He was then asked whether, in his opinion, if the skulls of the children had not been crushed or fractured, the fire would have destroyed all of the brain tissue. The doctor replied that he should have expected to find the brain intact even if the skull was almost burned. He was then asked this question: "Absence of the brain matter, then, and your failure to prove it, state what, in your opinion,

was the cause of your not being able to find it?" This question was objected to as not tending to prove any issue in the case, and as being incompetent and immaterial. The objection was overruled, whereupon the witness answered as follows:

"Well, I do not know what was the cause, but from knowing—from seeing the other brains—the heads of the others, with the brain intact,—largely had not been destroyed—I would conclude that, from some cause or other, the skulls of these children had been crushed or destroyed in order that the fire would get to the brain, and my judgment would be that the brain was torn asunder—torn apart in some way. The destruction was partial there, or else the fire would not have consumed the brain. It would have been incrusted down, like the other two. That would have been my judgment."

Counsel for the Defendant: "I object to that, and ask that it be stricken from the record."

By the Court: "Well, I do not know that it makes any difference that it is in or not."

Counsel for Defendant: "Well, it tends to prejudice the minds of the jurors."

By the Court: "O fiddlesticks! Go ahead."

Without stopping to consider the very undignified and improper manner in which the court disposed of this objection by the use of the expression, "O fiddlesticks," it is our opinion that it would be proper to show by competent testimony that these children came to their deaths by having their skulls crushed, for the same reasons given above regarding the death of Mrs. Hubbell. We think the court should have stricken the answer of Doctor Todd from the record, not because the subject-matter of the inquiry was improper, but because his answer hardly amounted to a scientific opinion. It is little more than a guess on his part,

239 Sup.—37

and is based entirely upon the assumption that the
skulls were not wholly burned, when in fact it ap-
peared in evidence that the skulls of the children were
entirely consumed. He does not, however, impute the
destruction of the skulls to a blow administered by
any person. He simply concludes that "from some
cause or other the skulls of these children had been
crushed or destroyed." This might have been from
a blow, or it might have been caused by falling tim-
bers during the progress of the fire, or it might not
have occurred at all. It hardly amounts to the dignity
of testimony, and we cannot conceive that it could have
made a serious impression on the minds of the jurors.
But, whether it did or not, it in no way connected the
death of these children with the defendant; and while
it might have, in the minds of the jurors, in some de-
gree magnified the enormity of the crime, it had no
tendency to connect the defendant with the crime, and,
therefore, was not prejudicial to him.

Counsel for defendant do not attempt, in their
brief or oral argument, to deny that a crime had been
committed, or to diminish its magnitude. Their sole
defense was and is that the defendant is not the man
who committed the deed. Under the instructions of
the court, the defendant, if guilty at all, was guilty of
murder in the first degree.

VIII. Objection is made to the introduction in
evidence of the overalls, shells and shoes, on the
ground that changes had been made in some of the
articles, and because there was no proof that defend-
ant wore the shoes on the day of the homicide. This
objection is without merit. No substantial changes
were made in the articles, and the shoes were made
competent when the proof showed that they belonged
to the defendant, were found in his bedroom the day

following the homicide, and that the heel of one of them corresponded with the heel mark from which the dogs took the trail.

IX.   The prosecutor, in his opening, stated to the jury that the State would prove threats by defendant against the deceased.   No such proof was made. No objection was made to this statement at the time. Naturally so, because the evidence, if produced, would be competent; and the defendant would naturally suppose that the State had such evidence.   The defendant predicates a charge of bad faith upon the mere fact that the evidence was not produced.   This is not enough.   There is nothing in the record to indicate that the prosecutor did not expect, when he made the statement, to produce such testimony.   He may have had reasonable grounds then to believe that such evidence was available.   Surely there is nothing shown in the record on this point which will warrant a reversal.   The situation is entirely different from that in State v. Kennedy, 177 Mo. 98, relied upon by defendant.   In that case the prosecutor stated that he would produce evidence which he must have known was incompetent, and which was highly prejudicial.

X.   Complaint is earnestly urged against certain remarks by the prosecuting attorney to the jury in closing the case.

There were some things said in the argument sounding in forensic fury that were, to say the least, questionable in taste and propriety.   They could much better have been left unsaid.   They were rebuked by the court, rather mildly it is true, but no objection was made or exception saved as to the sufficiency of the rebuke.   They are, therefore, not before us for review.   [State v. McMullin, 170 Mo. 632.]

One expression used by the prosecutor demands further consideration. He denounced the defendant as a "foul demon and monstrosity." This was objected to. The objection was overruled and exception saved. Then the prosecutor resumed: "You promised me that if, under the law and the evidence, in your judgment—on your conscience—the facts in the case warranted it—you promised me that you would remove the demon." After the prosecutor had continued for some time, the court said to counsel for defendant: "Mr. Cook, in the confusion I didn't hear exactly the cause for your objection. What was it?

"By Mr. Cook: I made the objection because it was an improper remark to make about the defendant in the presence of the jury.

"By the Court: What improper remarks did he make about the defendant?

"By Mr. Cook: The record will—

"By the Court: Well, I don't recall it. If there were any improper remarks, or any remarks denouncing the defendant in connection with the crime, unless it was coupled with the condition that the evidence showed him guilty, the jury will disregard any such remark. Counsel can't testify in the case on either side."

There was no further objection or exception by defendant. The record thus shows that the court took such action as it thought proper in withdrawing the language objected to from the jury, and in rebuking counsel. As the counsel for defendant did not ask further rebuke or action by the court, nor further except, it must be assumed that they were satisfied with the action of the court. [State v. Murphy, 201 Mo. 691; State v. Harvey, 214 Mo. l. c. 411.] Furthermore, taking all that the prosecutor said together, it amounts to a declaration that if the jury should find the de-

fendant guilty they should regard him as a "monstrosity" or "demon." Who can say that the perpetrator of this atrocious murder was not fairly characterized by such epithets? We are not disposed to reverse the case on the ground that the prosecutor, in the heat of argument, used epithets which, though out of place, were suggested by the facts in evidence. This is entirely different from mere abuse, not related to the legitimate evidence in the case. The following observation was made by this court in State v. Griffin, 87 Mo. l. c. 615:

"In calling the defendant a murderer, he only pronounced him what his whole argument must have been devoted to in an attempt to demonstrate him to be, and while I think it would be in better taste to abstain from the use of such epithets, we cannot reverse the judgment because the attorney called the accused what the evidence for the State tended to prove him to be."

The above is quoted with approval in State v. Gartrell, 171 Mo. l. c. 513. In State v. Zumbunson, 86 Mo. l. c. 113, this court said: "Neither language of invective, if called forth by the character of the crime, which the evidence in a case tends to disclose, nor urgent appeals to the triers of the facts to do their duty, will justify us in reversing a judgment." [See also State v. Brooks, 92 Mo. 542; State v. Allen, 174 Mo. 689; Franklin v. Railroad, 188 Mo. l. c. 545.]

This court has not heretofore and does not now approve the use of epithets in any case. It is improper for the law officer of the State to attempt to move the passions of the jury by abuse of the defendant; but we cannot, in the interest of justice, reverse a case solely because the prosecutor uses offensive and improper language in his argument to the jury, if we are satisfied that the verdict was based solely upon

the evidence and the law as declared by the court, un-influenced by such language. In this case, if the jury believed the evidence for the State, we think the re-sult could not have been affected by the epithets com-plained of.

XI.   Complaint is made of the instructions given, and failure to instruct on all the law of the case, as follows:

(a)   That the court should have given an instruc-tion concerning the other alleged crimes, namely, the killing of the wife and children, limiting the consider-ation by the jury of such proof to its relation to the crime charged in the information, namely, the killing of Oda Hubbell, and not merely to show that other crimes were committed. It is unnecessary to decide whether any instructions on this point would be proper, if requested. It is sufficient to say that no such instruction was requested. This was a collateral matter, concerning which the court would not be re-quired to instruct, unless specifically requested by defendant. A general objection of failure to instruct on the whole law of the case was insufficient.

(b)   That the court erred in failing to instruct on murder in the second degree. All the facts point to deliberate, premeditated murder. There is no ba-sis in the evidence for a lower degree of crime. This being so, no error was committed in failing to instruct on second degree murder. [State v. Rumfelt, 228 Mo. 443; State v. Tettaton, 159 Mo. 354; State v. Barring-ton, 198 Mo. 103; State v. Hopper, 71 Mo. 425.] No complaint is made of the instructions given for the State. They are in the usual form, and fairly cover the case.

(c)   Complaint is made of the court's refusal to give certain instructions offered by the defendant on

the questions of reasonable doubt, presumption of innocence, circumstantial evidence, and burden of proof. The instructions so offered were well enough as declarations of law as approved by this court. Their substance, however, was fully covered by the instructions given by the court, and they were, therefore, properly refused.

(d) The defendant offered an instruction withdrawing the bloodhound testimony from the consideration of the jury. As we hold such evidence to be competent, the instruction was properly refused.

(e) It is not seriously contended here that the instruction in the nature of a demurrer to the evidence should have been given. Under the testimony, this instruction was properly refused. Although purely circumstantial, the evidence in the case fully warranted the verdict of the jury.

XII. Complaint is made in the motion for new trial that the audience in the courtroom applauded at the close of one of the closing speeches for the prosecution. Here is what occurred:

"By the Court: We can't have any of that in here.

"By the Sheriff: Quiet! Quiet!

"By the Court: That is a very serious offense, very; unpardonable. The jury will disregard any such manifestations. It is very offensive and very inappropriate. Go on."

No objection was made by the defendant to the court's action in the matter. We do not see what more could have been done by the court. This demonstration could not have been anticipated. Nor may we assume that the jury would permit this show of popular feeling to sway them in their fidelity to their oaths to decide the case solely upon the evidence and the in-

structions of the court. [State v. Gartrell, supra; State v. Dusenberry, 112 Mo. 277.]

XIII. The twenty-fourth ground set out in the motion for new trial is as follows:

"The defendant says he was prejudiced and prevented from having a fair and impartial trial in this cause because Joseph Norman, who was one of the panel of twelve jurors who tried said cause, was biased and prejudiced against him at and before the time of his qualification as such juror, and that said bias and prejudice was not revealed to defendant by said Joseph Norman on his *voir dire* examination in this cause; that the said Joseph Norman, after being summoned on the panel and before his *voir dire* examination, in the presence of divers persons, expressed his opinion in the cause in the following language: 'If I get on the jury I will hang the son-of-a-bitch,' and 'I am going to hang the son-of-a-bitch,' and that this defendant had no knowledge of such bias and prejudice on the part of said juror until during the closing arguments in said cause."

This was sworn to by defendant and his counsel. Defendant filed three affidavits, each to the effect that the affiant heard the juror, Norman, on January 29th, and after he was summoned on the venire of one hundred, use the expression set out in the motion. The affidavit of juror Norman, denying the charge, was filed by the State. The State also filed affidavits of several persons to the effect that they were present on the occasions referred to in the affidavits first filed, and did not hear Norman make the remarks. Affiants Cox and Bailey, whose affidavits contained the charge against the juror, were called into court, and testified that the remarks of the juror referred to in their affidavits were made in a joking way in answer to

a question asked in the same spirit.   Many affidavits were filed for and against the motion, and several witnesses, including the juror Norman, were examined in open court.   There was testimony to the effect that the juror had said, after the trial, referring to the alleged remark, "If I said it, I said it in a laughing way."   This was also denied by the juror.  On his *voir dire* examination the juror said he had formed no opinion on the merits of the case, and had no bias or prejudice against the defendant.   There were several hearings on this motion, full opportunity being given to both sides to produce testimony.   After thorough investigation, the trial court held that the charge had not been sustained.

The ruling of the court against defendant on this ground in the motion for a new trial must be sustained on two grounds:

First.   Because the motion and affidavit attached thereto lack an essential feature.   They should show that knowledge of this alleged prejudice did not come to either the defendant or his counsel until after the case was submitted to the jury.   The allegation is that the knowledge came to the *defendant* "during the closing arguments."   If counsel knew of this prejudice on the part of the juror before the case was closed, it was their duty to arrest the trial at that time and call the attention of the court to the matter.   It was the duty of the defendant, when he learned of it, even during the closing arguments, to have it brought to the attention of the court through his counsel.   He should not be permitted to lie in wait on the chance of a favorable verdict, and then, in the event of an adverse verdict, be allowed to take advantage of this fact of which he had prior knowledge.   Such conduct has been held to amount to a waiver.

In State v. Robinson, 117 Mo. 649, speaking of a charge of misbehavior against a juror during the

trial, we said: "If the complaining party knew during the trial of such misbehavior it was his duty to call the immediate attention of the court to it, and not take his chance of a reversal based on such ground." This was expressly approved in State v. Richardson, 194 Mo. 326, and again in State v. Barrington, supra.

In Thomas v. State, 109 Tenn. 684, where it was charged in the motion for new trial that the juror had, prior to the trial, expressed an unfavorable opinion of the defendant, the court says on this point:

"It does not appear by affidavits of the plaintiff in error, or of his counsel, or otherwise, that the alleged disqualification of the jurors attacked was unknown to them when they were sworn, or at other times before the verdict was rendered, or that he called the attention of the court to their disqualification as soon as he received the information. This is necessary in all cases where new trials are asked upon account of the misconduct or disqualification of jurors. Parties cannot knowingly permit incompetent jurors to try their cases, and then take advantage of the incompetency when the verdict is adverse to them. They cannot experiment with the courts in this way, but must call the attention of the trial judge to the facts in the proper manner at the earliest opportunity, or they will be held to have waived the disqualification. Attacks upon jurors after adverse verdicts are said by Judge CARUTHERS in Mann v. State, 3 Head, 373, to be the last resort of the worst of criminals, and will always be closely scrutinized and required to be clearly made out to be effective. The presumption is in favor of the qualification of the jurors and of the regularity of trials, and this presumption must be overcome by clear and competent evidence before a motion for a new trial will be allowed for these reasons. This assignment of error must be overruled."

We have repeatedly decided that where such a charge is made against a juror, the affidavits must show that neither the defendant nor his counsel learned of the facts until after the case was submitted to the jury. [State v. Barrington, supra; State v. Richardson, supra; State v. Howard, 118 Mo. 127; State v. Burns, 85 Mo. 47; State v. Hunt, 141 Mo. 626.]

Second. The finding of the trial judge on the controverted question of fact involved must be deferred to if it is fairly supported by the evidence. His summing up, preserved in the record, of the evidence produced before him, shows that he thoroughly comprehended the importance of the question, and that he had given the evidence careful consideration. He was in position to estimate and weigh it carefully and fairly. The law does not favor charges which seek to impeach the verdict of a jury. They must be clearly established. The presumption of fairness and regularity is not easily disturbed. This is especially true where the entire proceedings are under the eye of a vigilant trial judge who has exceptional opportunity to form a fair estimate of the character of the persons involved. [Thompson on Trials, sec. 117.]

In State v. Howard, 118 Mo. 1. c. 136, we said: "In the second place, the circuit judge possessed far better opportunities than we of determining the very right of the matter here at issue, and as there were affidavits *pro* and *con* on this point; as the trial judge was doubtless acquainted with each of the affiants; as every lawyer knows how easily affidavits impeaching the impartiality of jurors are procured, and, when the dangerous consequences which would result from lending too facile an ear to post-trial complaints of this sort are considered, we feel no inclination to hold otherwise on this point than did the trial court."

The trial court further expressed the opinion that, inasmuch as the evidence of the defendant showed that the remark, if made, was in jest, and not the expression of a deliberate opinion, it would not, even if made, justify a new trial. This view is supported by the following cases: Smith v. Com., 2 Va. Cas. 6; O'Shield v. State, 56 Ga. 696. We are not called upon to pass on this point, and do not do so.

Upon full consideration, we must hold against defendant on this assignment.

XIV. Counsel for defendant make bitter charges of passion and prejudice in the trial of this case, and of undue haste and want of opportunity for full preparation. We give them credit for having made a brave defense of an unfortunately unpopular cause. They were appointed by the court to defend the prisoner. They have done their full duty. Because of the terrible character of the crime, which is likely to arouse strong adverse sentiment, and because of the serious charges of unfairness, we have realized the importance of our duty to thoroughly review this trial, and to see to it that the defendant be not denied any safeguard which the law throws around one charged with crime. It cannot be expected that a trial of this length and importance will be wholly free from minor errors. So long as judges and lawyers are human, and are called upon to act promptly, without opportunity for due deliberation, mistakes must occur. But cases must come to an end. It is the wise policy of the law to reverse judgments for errors only that go to the substantial rights of parties. After careful consideration, we conclude that no substantial right has been denied the defendant.

Finding no error in the record, we affirm the judgment and direct the sentence pronounced to be

executed (R. S. 1909, Sec. 5314), and appoint the 26th day of March, 1912, as the day for the execution of the sentence. *Kennish* and *Brown, JJ.*, concur.