THE STATE v. OWEN B. MURPHY, Appellant.

Division Two, February 18, 1922.

1. **JURORS: Murder: Regulars Excused: Alternates.** The statute (Sec. 6617, R. S. 1919) does not contemplate that alternate jurors shall be called in the event a regular juror is excused upon challenge for cause. Such alternates may only be summoned when a regular juror is disqualified from serving as a member of the regular panel, has been excused from jury service, or has failed to attend the court.

2. **————: Qualifications: Conscientious Scruples.** Jurors who confess to conscientious scruples against the infliction of the death penalty are properly excused from service in the trial of a defendant charged with murder in the first degree.

3. **TRIAL: Absence of Defendant: Testimony of Witness.** While defendant's presence during his trial for murder cannot be waived, his substantial rights were not prejudiced by his absence while a witness for the State was testifying, where all the testimony to which the witness testified in his absence was purely introductory and related in no wise to vital issues in the case, and after defendant was brought in the testimony of the witness was a substantial repetition of the same facts elicted during his temporary absence. The failure to observe the statutory and constitutional provisions requiring defendant's presence during the trial is technical error, but where it appears that the defense was in no wise prejudiced thereby the error should not work a reversal; and where the testimony of a witness in defendant's ab-

sence related to no vital issue in the case and was substantially repeated after he was brought in, the failure of the court to instruct the jury to disregard such testimony is not controlling.

4. ———: **Reference to Defendant as Prisoner.** The reference to defendant by the prosecuting attorney in the examination of witnesses as "the prisoner here" is not prejudicial to defendant, especially where defendant by his own showing has been in jail since the day of the homicide.

5. ———: **Cross-Examination of Defendant.** It is not error on the cross-examination of defendant to ask him questions concerning the very matter to which he testified in chief.

6. ———: **Rebuttal: Repetition.** It is not prejudicial error to permit a witness in rebuttal to repeat the same deni 1 he made when first examined.

7. **INSTRUCTION: Murder in the Second Degree: Definition.** An instruction telling the jury that murder in the second degree is the killing of a human being willfully, premeditatedly and with malice aforethought, but without deliberation, correctly states the law.

8. ———: **Manslaughter: Intentional Killing: No Heat of Passion.** Defendant cannot complain of an instruction telling the jury that if defendant intentionally shot and killed the deceased without malice, deliberation and premeditation and not in self-defense, they should find him guilty of manslaughter, where he himself testified that he shot deceased to prevent injury to himself and his father, and no witness testified to facts indicating that his passion was aroused by the acts of deceased.

9. ———: **Threats: Acts.** Threats may be shown as well by acts as by words. Where defendant on the previous day was carrying a gun and made an uncalled for assault upon deceased by covering deceased with said gun, it was not error to instruct the jury that if defendant made any threats against deceased, such threats should be considered in determining whether defendant was the aggressor and his intentions in entering into the difficulty, if he did enter into it.

10. ———: **Assumption of Disputed Fact: Manslaughter.** An instruction which assumes as a fact that deceased assaulted defendant and his father with a rock, and declares that such assault constituted just cause of provocation, should be refused.

11. ———: ———: **Facts Applicable to Self-Defense.** Facts applicable only to the issue of self-defense are not a proper basis for an instruction on manslaughter.

State v. Murphy.

12. **ARGUMENT TO JURY: No Objection.** Remarks made by the prosecuting attorney in his argument to the jury cannot be considered on appeal where the transcript fails to show any objection thereto, or any invocation of a ruling thereon, or any adverse rulings in connection therewith.

13. **DEMONSTRATION IN COURT ROOM.** A spontaneous clapping of hands by persons in the crowded courtroom, at the close of the prosecuting attorney's argument to the jury, is not a sufficient ground for setting aside a verdict of guilty, where the attorneys on both sides disclaim any previous knowledge of or responsibility for the demonstration, and the court rebukes the audience and instructs the jury to disregard and not to be influenced by the same and carefully and pointedly inquires of them if they will disregard it, and receives an affirmative answer thereto. And especially should this be the ruling where the verdict itself bespeaks moderation, and excludes the idea that the jury were influenced by the demonstration.

14. ————: **Public Trial: Limiting Audience.** While a defendant charged with a criminal offense is to be accorded a public trial, this does not mean that the court should permit the crowding of the courtroom during a trial when public feeling is running high, but in such conditions the court should limit the attendance in a reasonable and impartial manner.

Appeal from Macon Circuit Court.—*Hon. V. L. Drain,* Judge.

AFFIRMED.

*Matthews & Jones* for appellant.

(1) The right to trial by jury is a fundamental right and this means trial by jury selected under the forms prescribed by law. The defendant had a right to expect and the court, as a matter law, was required in selecting the jury, to exhaust first the regular panel and the substitutes therefor and to require that the special *venire* should be taken from the body of the county. The statute does not contemplate that a defendant charged with murder should be tried by a jury selected at the mere whim or convenience of the sheriff. (2) The defendant was denied due process of law, in that he was not per-

sonally present at all stages of the trial and confronted by the witnesses against him. The court permitted the witness Ives, in the course of the trial, to testify for the State, while the defendant, without fault on his part or the part of his attorneys, was absent from the courtroom and locked up in the county jail. The witness was sworn in the absence of the defendant and testified to matters material to the issues and was never re-sworn, nor did he re-testify to the facts, testified to in the absence of the defendant, in the presence of the defendant, nor was the jury discharged in said cause or re-sworn in the presence of the defendant to try the case according to the law and the evidence. Art. 2, Secs. 22, 30, Mo. Constitution; State v. Bobbst, 269 Mo. 223; State v. Warner, 165 Mo. 399; State v. Hoffman, 78 Mo. 256; State v. Brown, 63 Mo. 439; State v. Smith, 90 Mo. 37; State v. Long, 209 Mo. 380; State v. Hope, 100 Mo. 347. The right of defendant to be present under the circumstances of this case is a right that cannot be waived by the defendant. Hopt v. People of Utah, 110 U. S. 574; Diaz v. United States, 223 U. S. 442; 8 R. C. L. 90. The defendant had the right to confront the witnesses against him. Spurgeon v. Commonwealth, 86 Va. 655. The court committed error in instructing the jury in the absence of the defendant. 8 R. C. L. 90; Diaz v. United States, 223 U. S. 442. (3) Instruction 3 does not properly define the law as to murder in the second degree. (4) The court committed error in giving Instruction 4, in that, it fails to point out and direct the jury how to ascertain whether the defendant had just cause or provocation for the homicide. The instruction is a mere abstract statement of the law and leaves the jury at sea in applying it to the evidence. (5) Instruction 4 does not define "just cause or provocation." "Just cause or provocation" is a legal conclusion deduced from a given state of facts. In the absence of a definition of "just cause or provocation" an instruction embodying the terms is error and Instruction 4 was error. State v. Harkness, 100 Mo. 666; State v. Ripley, 242 Mo. 479; State v. Grant, 152 Mo. 70.

(6)  The court committed error in giving Instruction 5 on behalf of the State, because the record contains no evidence of threats communicated to the defendant.  The instruction assumes that the defendant based his conduct upon threats while the record shows that he acted solely upon appearances at the time of the homicide.  It misleads the jury as to the real cause of the homicide.  (7) The court committed error in giving Instruction 6 on behalf of the state, because said instruction assumes that the defendant made threats and voluntarily entered into the difficulty.  There is no evidence in the record. of threats against the deceased and the record clearly shows that the deceased started the difficulty on the morning of the homicide. On the false premises thus laid, the court tells the jury that they may find that the defendant was the aggressor and that he began the affray with the intent to commit murder.  (8)  Instruction 7 on behalf of the State should not have been given because it authorizes the jury to find: first, that the defendant sought the difficulty; second, that he brought it on; and third, that he voluntarily entered into it; and there is no evidence in the record to warrant even an inference that he sought the difficulty with the defendant, nor is there any proof that he brought it on, or voluntarily entered into it.  The instruction is broader than the evidence in the case.  (9) The court committed error in refusing Instruction 9, offered by the defendant.  The defendant was entitled to have any theory of defense warranted by the testimony set forth in the instructions.  12 Cyc. 612; State v. Webb, 205 S. W. 187; State v. Douglass, 258 Mo. 291; State v. Starr, 244 Mo. 161; State v. Wineberg, 245 Mo. 575.  (10) Instruction 10 offered by the defendant should have been given as correctly embodying the theory of manslaughter and applying the evidence thereto, and for further reason that no instruction given for the State or the defendant embodied the theory that the deceased was the aggressor. (11)  The demonstration at the close of the argument was such as to sway the jury and to inflame it with passion and prejudice against the defendant, so that the defend-

ant, by reason thereof, did not have a fair and impartial trial, and the court committed error, first, in refusing to discharge the jury at the request of defendant's counsel; second, in refusing to investigate and punish the offenders as requested by the counsel for defendant; third, in assuring the jury that it was not a planned demonstration but a spontaneous outburst, coming from every part of the large court-room; fourth, in failing to specifically charge the jury that they must disregard the demonstration; fifth, in failing to clear the courtroom and in allowing the jury to come in contact with the mob. State v. Rasco, 239 Mo. 533; State v. Dusenberry, 112 Mo. 293; State v. Gartell, 171 Mo. 513.

*Jesse W. Barrett,* Attorney-General, and *J. Henry Caruthers,* Assistant Attorney-General, for respondent.

(1) The competency of a juror is a mixed question of law and fact, to be determined by the trial court from the whole examination, and the finding of the court, unless clearly wrong, will not be disturbed by this court. State v. Cook, 84 Mo. 40; State v. Gonce, 87 Mo. 627; State v. Cunningham, 100 Mo. 382; State v. Howard, 118 Mo. 127; State v. Brown, 119 Mo. 527; State v. Jackson, 167 Mo. 291. (2) When the record shows that the defendant was present at the commencement or at any other stage of the trial it shall be presumed, in the absence of all evidence in the record to the contrary, that he was present during the whole trial. Sec. 4008, R. S. 1919; State v. Lewis, 69 Mo. 92; State v. Yerger, 86 Mo. 33; State v. Neighbors, 179 Mo. 351; State v. Brock, 186 Mo. 457; State v. Long, 209 Mo. 336. The record proper can never be contradicted by anything contained in the bill of exceptions. The record proper in the case at bar shows the presence of the defendant from arraignment to appeal. Weber v. Schmeisser, 7 Mo. 601; State to use v. Sanger, 28 Mo. 314; State v. Steptoe, 65 Mo. 640; State v. Timeus, 233 Mo. 308. (3) The record shows that all the instructions given the jury were in writing and in

the presence of the defendant. Appellant complains in his brief that the court erred in "instructing" the jury in appellant's absence. The bill of exceptions fails to show that the court gave any instructions to the jury in the absence of appellant and that timely exceptions were made thereto, hence nothing presented to this court on this point for review. State v. George, 214 Mo. 262; State v. Upchurch, 191 Mo. 43; State v. Finley, 193 Mo. 202. (4) Instruction 3 for the State correctly declares the law and was properly given. State v. Bauerle, 145 Mo. 18. (5) Instruction 4 for the State on manslaughter should not have been given, for the reason that there is no evidence in the case that the killing was done in a heat of passion, but on the contrary the defendant's own testimony was that his "intention in shooting was to keep himself or his father from being killed." 2 Bishop's New Criminal Law, sec. 718; State v. Webb, 205 S. W. 187; State v. McKenzie, 228 Mo. 385; State v. Baker, 246 Mo. 375; State v. Rumfelt, 228 Mo. 443. (6) Threats alone will not justify an assault, and Instruction 5 for the State correctly stated the law and applied to the evidence. State v. Elliott, 90 Mo. 350; State v. Griffin, 87 Mo. 608; State v. King, 78 Mo. 555; State v. Barrett, 240 Mo. 161; State v. Gieseke, 209 Mo. 331. Appellant had drawn a gun on deceased the day before the killing which was a serious threat and sufficiently supports Instruction 6 for the State as to defendant's intention. State v. Pennington, 146 Mo. 27, 35. (7) One who seeks, brings on or voluntarily enters a difficulty for the purpose of wreaking his malice is not entitled to acquittal on the ground of self-defense. State's Instruction 7 on self-defense is correct and was properly given under the evidence. State v. Gieseke, 209 Mo. 331; State v. Starr, 38 Mo. 270; State v. Partlow, 90 Mo. 608. (8) Defendant's Instruction 9, 10 and 11 were properly refused since there is no evidence that defendant shot deceased while in a heat of passion. State v. Webb, 205 S. W. 187. (9) The demonstration of the audience at the close of argument of the prosecuting attorney was spontaneous and

not anticipated and the court promptly called it to order and directed the sheriff to keep order and admonished them to keep quiet. No exceptions were saved to the court's ruling and appellant only asked that jury be discharged, hence no reversible error. State v. Rasco, 239 Mo. 583; State v. Dusenberry, 112 Mo. 293; State v. Gartrell, 171 Mo. 513.

DAVID E. BLAIR, J.—Defendant was convicted of murder in the second degree, was sentenced on the verdict and has appealed. The information charged murder in the first degree, alleging that the defendant shot and killed one William L. Knox at the county of Macon on October 27, 1919.

The testimony on the part of the State tends to show the following facts:

The deceased and defendant's father lived on farms in the same neighborhood near Kaseyville, in Macon County, Missouri. The defendant usually engaged in mining, and when that business was slack occasionally farmed. In the early summer of 1919 he had put in a crop of corn on a small tract of deceased's farm, and while attending same lived with his father. The shooting occurred on Monday morning, and on the preceding Sunday the defendant went to the corn field on deceased's premises to haul a load of corn. On entering the field the deceased objected to his taking the corn until the defendant had gotten out the deceased's share, and a quarrel occurred at that time. The defendant went on into the field and the deceased returned to the house, and, according to the testimony of Mrs. Ives, took with him a broom handle and went out into the field where defendant was loading the corn. The defendant had a double-barreled shotgun in his wagon and drew this gun on the deceased as he approached. The testimony on the part of the State does not disclose what was said at that time. The defendant hauled out his load of corn. Early the next morning the defendant, accompanied by his father, John Murphy, a man seventy-seven years of age, returned

to the corn field for the purpose of hauling a load of fodder, and drove into the field without interference from the deceased. The fodder was loaded and the defendant mounted the load in front and his father got on the load at the back end. As they approached a gap in the wire fence, the deceased approached from the house and opened the gate and after the wagon passed apparently closed the gap. A bitter quarrel then ensued between the deceased and the defendant over the hauling of the load of fodder. Fragments of the conversation testified to by the State's witnesses show in substance that the deceased was telling the defendant not to return for any more loads and to keep out of the field, and cursed defendant.

The Knox house was situated on the east side of the public road, and directly opposite and close to the fence was the home of Frank Malone, Sr. After leaving the field the team was turned north on the public road between these two houses, and at a point sixty or seventy feet south of the houses the defendant was seen to pick up his shotgun which was on the fodder beside him and shoot. The State's testimony tended to show that only one shot was fired. The charge of shot struck the deceased in the side of the face, throat and breast, and he at once fell and died within a few moments. Just prior to the shooting the team was moving northward, and the deceased was between the fence and the road walking toward his house. It appears from the testimony of all the witnesses that a bitter quarrel occurred between the deceased and defendant and much profane and obscene language passed between them. On firing the shot the defendant slid off the load of fodder to the side of the wagon opposite the Knox house, and continued going northward in that manner until both houses were passed.

The evidence on the part of the defendant tended to show that on Sunday morning preceding the killing the deceased came down in the field where defendant was loading the corn with a single-barrel shotgun in his hands, and not a broom stick, as testified to by Mrs. Ives, and that, as the deceased approached, defendant took his gun

in his hands, and that thereafter they discussed their differences and agreed that the defendant might haul out his corn. As to the instance occurring on the morning of the shooting, defendant's testimony tended to show that as the defendant and his father drove toward the gap in the fence, they saw the deceased and Mrs. Ives standing southeast of the Knox house, she apparently pleading with the deceased. After the deceased started toward the gap in the fence Mrs. Ives ran back to the house, presumably to inform her husband that trouble was brewing. As deceased approached the gap defendant saw him stoop down and pick up something. As the wagon drove through the gap the deceased cursed the defendant and his father and called them vile and obscene names, and the deceased did not close the gap. After the wagon had gotten out into the road he threw a rock which barely missed the defendant, and threw a second rock which struck defendant's father, fracturing a rib. The deceased called out several times, "Art, bring that gun," Art being the witness James Arthur Ives, a step-son of the deceased, who was visiting at the deceased's home. The defendant called out three times to the deceased to stop. The defendant saw Ives running toward the deceased with a shotgun in his hands and when twenty or thirty feet away he raised his shotgun and fired at the deceased in order to save his life and to prevent him either shooting himself or his father. Just after he fired, the defendant slid from the wagon in order to prevent Ives shooting him, and Ives did shoot twice.

Defendant's father testified that two of the shots lodged in his body, inflicting wounds, although no physician examined the shot wounds or the fractured rib. As the wagon proceeded on down the hill two more shots were fired by Ives. His story of the killing was practically the same as that of the defendant. Defendant drove on home, hitched up his buggy and drove to Macon and gave himself up to the sheriff. The defendant testified that at the time he fired the shot the deceased was holding out his hands as if reaching for the gun which was being

brought by Ives, and that at that time there was nothing whatever in his hands. Deceased was a man about fifty-five years of age and the defendant much younger. Defendant and his father testified that he usually carried the shotgun to shoot rabbits.

The facts outlined as being part of the State's testimony were testified to by some or all of the eyewitnesses, except the defendant and his father. All the other witnesses either denied or did not testify at all as to the witness Ives running from the Knox house with a shotgun in his hands, or that shots were fired by him at the defendant after he had shot the deceased. One of the State's witnesses testified that deceased called to Ives to bring his gun. An examination of the defendant's shotgun after the killing showed that only one shot had been exploded. Witness Frank Malone, Sr., testified to hearing three shots, but a witness for the State testified in rebuttal that he was hunting ducks within a distance of half a mile and heard a single shot fired in the direction of the Knox house just before he fired two shots at some ducks. These are substantially the facts as gathered from the voluminous record before us.

On the part of the State, as eyewitnesses to a part or all of the transactions, the following witnesses testified: James Arthur Ives, and his wife, Frank Malone, Jr., Tazzy Evans, Mrs. Frank Malone, Ursel Holman, Lloyd Malone, Hazel Malone and Frank Malone, Sr. Merrit Yutes, age seventeen, being at the time in the neighborhood, called by defendant, testified to hearing three shots from the direction of the Knox house. He testified that he heard one shot and heard dogs barking and women screaming, and two or three minutes thereafter heard two more shots. No witnesses other than the defendant and his father testified to the firing of five shots.

A number of witnesses were offered by the defendant tending to show that his reputation and that of his father for truth and veracity were good, and one witness testified that his reputation for peace and quietude was good.

The State introduced witnesses to show that the reputation of the defendant for peace and quietude was bad. The defense offered a few witnesses who testified to contradictory statements made by the State's witnesses.

On this testimony and under the instructions of the court, the jury returned a verdict of murder in the second degree and assessed the punishment of the defendant at imprisonment in the State Penitentiary for a period of thirty years.

Appellant's brief makes no assignment of errors, and we are therefore compelled to look to the motions for new trial and in arrest to ascertain the alleged errors of the trial court. Sixty-six grounds of error are contained in the motion for new trial and seventeen in the motion in arrest. Many of the grounds stated are mere repetitions of and ringing of the changes on grounds previously set out. Appellant will have little ground for complaint if some alleged error is overlooked by reason of his firing such a broadside of alleged error. After the smoke of battle cleared away and counsel wrote the brief for appellant, sixteen points were made with citations of authorities, and we think these fully cover the eighty-three assignments in the motion for new trial and in arrest—at least all points which merit discussion in this opinion.

The motion in arrest challenges the sufficiency of the information to charge the defendant with the crime of murder. The particulars in which the information is deficient are not pointed out in appellant's brief.

Information.

In our opinion the information is well enough and complies with the requirements of Section 3230, Revised Statutes 1919, defining murder in the first degree. Informations in substantially the same form have been repeatedly approved by this court. [See State v. Conway, 241 Mo. l. c. 271; State v. Wilson, 172 Mo. 424.]

I. Complaint is made as to the manner of selecting the panel of jurors, because of the failure of the trial court to exhaust first the regular panel and the substitutes therefor and to require that the venire shall be taken

from the body of the county. Defendant filed a motion to quash the panel, alleging in said motion that the court asked improper and irrelevant questions of the jury and improperly permitted challenges to such jurors and because of improper remarks of the prosecuting attorney during the challenge of the jurors for cause.

We have read all the testimony contained in the bill of exceptions relating to the examination of the jurors and are satisfied that the above complaints are unjustified. Said motion further urged that the panel be quashed because the jury was not properly impaneled and was not properly brought into court by the sheriff and because the substitute panel of the jury was not exhausted by filling up the regular panel before the special venire was called.

The motion to quash the panel is not verified and no proof of the facts alleged appears in the record. On April 26, 1920, the court ordered a venire of fifty men to serve as jurors in this case, such jurors to be in addition to the regular panel. The record further shows that on June 21, 1920, the date set for the trial, the sheriff returned into court a list of fifty persons summoned from the body of Macon County to serve as jurors. This recital of the record is the only evidence concerning the residence of the jurors and the charge made by appellant that the jurors were picked up on the streets of Macon has no support in the record.

Section 6617, Revised Statutes 1919, does not contemplate that alternate jurors shall be called in the event of a regular juror being excused on challenge for cause. Such alternates may only be summoned when a regular juror is disqualified from serving as a member

Jurors.     of the regular panel, has been excused from jury duty by the court or shall fail to attend the court. When a regular juror has appeared at the term and is accepted generally and on examination in any particular case is excused from such case only, the court should proceed in the regular manner. Said section provides for

filling the panel for the trial of any one case by summoning bystanders. The section must be reasonably construed. To require the summoning of alternate jurors from all townships of the county in proper proportion after a jury is being impaneled for the trial of any particular case would result in unreasonable delay and is not contemplated by Section 6617.

II. Complaint is also made of the action of the court in improperly excusing five jurymen on the challenge of the State. Their names are not given in the motion, but an examination of the proceeding appearing in the bill of exceptions discloses the fact that jurors Kunder, Ryan, Simmons, Johnson and Posey were excused Conscientious by the court, over the objection and upon the Scruples. exception of the defendant, because they confessed to conscientious scruples against the infliction of the death penalty. Section 4012, Revised Statutes 1919, explicitly provides that persons possessing opinions such as to preclude them from finding any defendant guilty of an offense punishable with death, shall not be allowed or compelled to serve as jurors on a trial of an indictment for any offense punishable with death.

III. The defendant complains that the court permitted the witness Ives to testify for the State while the defendant was absent from the courtroom and locked up in the county jail; that he was sworn in the absence of the defendant, and testified to matters material to the issues and was never re-sworn and did not Absence of re-testify to the facts testified to in the absence Defendant. of the defendant after the defendant was brought into the courtroom, nor was the jury discharged in said cause or re-sworn in the presence of said defendant to try the case according to law and the evidence. In support of such contention appellant relies upon the due-process-of-law provision of the State Constitution and the section which provides that the defendant in criminal cases shall have the right to appear and defend in person

and by counsel and to meet the witnesses against him face to face. The record with painstaking particularity at each session of the court and after each noon recess affirmatively recites that the defendant was in fact present in person. However, it appears from the bill of exceptions which has become a part of the record, that the witness Ives, called on behalf of the State, was asked and did answer a few questions before defendant was brought into court. He stated his name, age, residence, occupation and how long engaged in it, length of residence in Des Moines, Iowa; that he had engaged in no other business; that he had been away from Des Moines on occasional visits; that he was a step-son of deceased; that he came to Macon County October 21, 1919; that he was in France in 1918; that deceased lived in Morrow Township one and one-half miles from Kaseyville; that deceased formerly lived on a farm seven miles from Des Moines and was a farmer.

At this point the trial judge discovered the absence of defendant, stopped the proceedings and lectured the sheriff for his dereliction. After defendant was brought in witness Ives was recalled. A comparison of his testimony before and after defendant was brought in shows that the witness substantially repeated his testimony, except as to his occupation of locomotive engineer and the time engaged in that occupation and the fact that he had engaged in military service in France in 1918. It does not appear that the witness was re-sworn.

The recitals in the record that the defendant was present at the opening of the court in the mornings and after the noon recesses would be conclusive of his presence were it not for this incident appearing in the bill of exceptions. No exception was saved and no mistrial asked at the time.

While defendant's presence during his trial could not be waived, it is inconceivable how his substantial rights could have been prejudiced by his absence, in view of the substantial repetition of the testimony of the witness and in further consideration of the fact that all

testimony, both before he was brought in and covering the same ground after he was brought in, related in no way to the vital issues of the case and was purely introductory in its nature. Appellant cites a number of Missouri cases where reversals have been ordered because of the absence of the defendant at different stages of the trial. In some of these cases the defendant's presence was refused by the court. In none of the cases was the defendant inadvertently deprived of his right to be present in the courtroom during the taking of testimony where the testimony was introductory and unimportant, as here. We have found no case in this State on the exact question. In Cason v. State, 52 Tex. Cr. Rep. 220, and Vanderford v. State, 126 Ga. 753, similar situations arose. In both cases the trial judges instructed the juries to disregard the testimony and it was afterwards repeated in the presence of the defendant. The absence of the defendant was in each case held not to be reversible error under the circumstances. Exactly opposite conclusions were reached in Booker v. State, 81 Miss. 391, and State v. Greer, 22 W. Va. 800. Here the record does not show any instructions whatever to the jury, but since the testimony was merely introductory and had no other bearing on the vital issues in the case, the absence of instructions from the trial court withdrawing the testimony from the consideration of the jury is not controlling. The absence of defendant was technically an error.

The constitutional and statutory provisions requiring defendant's presence during the trial must be strictly observed, but the failure to observe such provisions is after all merely error, and when it is shown that the defense was in no wise prejudiced thereby, the error should not cause a reversal.

We overrule the assignment for that reason.

IV. Appellant claims error in the progress of the examination of witnesses because the court overruled his objection to reference to the defendant by the prosecuting

**The Prisoner.** attorney as "the prisoner here." We fail to see where the defendant was prejudiced by such reference, especially in view of the showing made by defendant's counsel in examining defendant as a witness that he had been in jail ever since the day of the killing.

Nor was there error committed in permitting the State to ask defendant, "You shot Knox, who was unarmed, and didn't look at Ives except as you saw him as you went off the wagon?" Defendant had previously testified that deceased was reaching or holding out his **Cross-Examination.** hands toward Ives; that Ives was then coming toward the deceased bringing him his gun; that at the time he shot he saw nothing in deceased's hands. Defendant claimed he shot in defense of himself and his father and it was proper to show that when he fired the shot the deceased was unarmed and therefore not in a position to do him or his father any serious harm and the cross-examination on this subject was proper.

The trial court is charged with error in permitting the State to introduce testimony said to be improper as rebuttal. As to witness Mrs. Frank Malone, Sr., the record shows that she was not permitted to answer any **Rebuttal.** questions in rebuttal. But appellant claims the court permitted her to answer in effect by nodding or shaking her head, and such objection was made at the time. We have no means of verifying such actions on the part of the witness and the court made no ruling disclosing such conduct, nor is any exception noted. In any event, the scope of rebuttal testimony is largely within the discretion of the trial judge.

Witness James A. Ives, was called in rebuttal and was permitted to deny taking his gun and running toward the place where deceased and the defendant were quarrelling and was permitted to deny the firing of any shots after the defendant fired the fatal shot. When testifying as a witness for the State in chief he was cross-examined as to such matters and at that time made denial of such

State v. Murphy.

actions. It is difficult to see how defendant could have been prejudiced by the second denial. It was no abuse of the discretion of the trial court to permit a repetition of the denial in rebuttal after defendant had testified to such conduct on Ives's part.

V. The State's Instruction No. 3 is criticised as not properly submitting murder in the second degree. No authorities to support the criticism are cited. The instruction told the jury that murder in the second degree is the killing of a human being wilfully, premediatedly and with malice aforethought, but without deliberation. It is an approved definition and the instruction is well enough. [State v. Bauerle, 145 Mo. l. c. 18, and cases there cited.]

Murder in Second Degree.

State's Instruction No. 4 is criticised. It told the jury that if defendant intentionally shot and killed the deceased without malice, deliberation and premeditation and not in self-defense, they should find him guilty of manslaughter. Defendant is not in a position to complain of said instruction. There was no evidence that the killing was done in the heat of passion. Defendant testified that he shot to prevent death or serious injury to himself or his father and nowhere testified to any facts indicating that his passion was aroused by the acts of deceased. Defendant's father testified that defendant did not appear to be excited or mad. Under all of defendant's testimony the killing was in self-defense. There is nothing in the testimony offered by the State to authorize an instruction on manslaughter. [State v. McKenzie, 228 Mo. 385, l. c. 401; State v. Gartrell, 171 Mo. l. c. 520.]

Manslaughter.

State's Instruction No. 5 is said to be improper because there was no evidence of threats by deceased against defendant, and therefore the instruction as to the effect of such threats was improper. In testifying as to the reasons why he shot deceased, defendant said, "Well, he had threatened us both by saying he wanted to blow our God damn—and some-

Threats.

thing else—off." Witness Herring also testified that deceased had told him that he had trouble with defendant and "we had a hell of a racket over it and he drawed a gun on me and I told them both to come down off the wagon and I would whip them both;" and further that "he wasn't afraid of no damn man or beast or devil." The evidence of threats was sufficient to justify the instruction.

State's Instruction Six is criticised. It told the jury if defendant made any threats against deceased such threats should be considered in determining whether the defendant was the aggressor and his intentions in entering into the difficulty, if he did enter into it. The evidence on the part of the State tends to show an uncalled for assault by defendant on deceased the day before the killing by covering him with a gun. Threats may be shown as well by acts as by words. In view of what what occurred on the previous day the fact that defendant was carrying a shotgun with him while going after the fodder, over the very serious objection of deceased, may well have been regarded as a threat of personal violence against deceased if he resisted defendant in carrying out his will. The instruction was proper under the circumstances.

State's Instruction No. 7 is criticised because it authorized the jury to find that defendant sought the difficulty and voluntarily brought it on. Such fact might have been fairly inferred by the jury from the fact that defendant and deceased had been in a serious quarrel with a show of arms the previous day and because defendant knew deceased strenuously objected to his removal of the corn and fodder and that a renewal of the demand would likely renew the controversy. These facts, together with the fact that defendant went armed to the scene of the encounter, were sufficient basis for the instruction.

**Seeking Difficulty.**

Instruction No. 9 offered by the defendant was properly refused because it tells the jury that if the deceased assaulted the defendant or his father with a rock, such

State v. Murphy.

**Assumption of Fact.** assault constituted just cause of provocation, and thereby assumes a fact which was for the jury to determine. Furthermore, this instruction was properly refused for the reasons heretofore discussed in holding that no instruction on manslaughter should have been given.

Defendant's Instruction No. 10 is a comment upon the testimony and contains a submission of the question of manslaughter. It was properly refused.

Defendant's Instruction No. 11 was properly refused. It recites certain facts as being sufficient to arouse violent passion and to be sufficient to justify a verdict of manslaughter. It is also a comment on the evidence. The facts therein sought to be submitted to the jury were only applicable to the issue of self-defense.

The issues sought to be submitted in Instructions Nos. 12, 13, 14, 15 and 17 were fully covered by other instructions in the case and no error results from their refusal by the trial court.

VI. Appellant complains of the argument of the prosecuting attorney in telling the jury that they could not pardon the defendant, that such power was in the Governor of the State; thereby intimating that the jury could shift its responsibility; and again, in permitting the prosecuting attorney to refer to the defendant as a coward, because he was hiding behind his little daughters; and again in permitting the prosecuting attorney to tell the jury that the father of the defendant was an interested witness because he told his story in the shadow of the gallows; and again, in permitting the prosecuting attorney to tell the jury that the crowd in the court-room and the people of Macon County and of Missouri and of Iowa had their ears to the ground and were watching the jury and wanted them to convict the defendant.

We have examined the transcript of the closing speech of the prosecuting attorney in which the above statements appear in substance and find that no objection was entered by appellant to such remarks and no ruling

of the court was invoked thereon or exceptions saved to adverse rulings. The question of improper argument is therefore not before us for consideration.

VII.  At the conclusion of the closing argument of the prosecuting attorney a demonstration by handclapping was made by persons in the audience. It appears from the affidavits filed that between five and six hundred spectators were crowded into the courtroom, occupying all the seats and standing in the aisles and even crowding inside the space reserved for the bar. When such demonstration occurred the trial judge rapped for order and directed the sheriff to keep order, rebuked the audience and commented on its previous proper conduct. Counsel for the defendant asked for the discharge of the jury because the demonstration was made for the purpose of influencing the jury. The court refused to · discharge the jury and proceeded to caution the jury and commented on the seriousness of the offense of the audience and stated that he regarded it as spontaneous and not planned. Counsel for the State and for defendant disclaimed knowledge of or responsibility for the demonstration. The following question was then put to the jury by the trial judge: "Can you gentlemen disregard this and not be influenced by the demonstration and render a fair and honest verdict, as you shall answer to your country and your God?" The record then shows that the jurors nodded their heads in assent. The court then asked, "You can do that?" The notes show: "Some of the jurors answers, 'Yes, sir,' and others say they will go according to the law and the evidence."

Counsel for defendant asked that, before the jury retired, the court ascertain if it was a prepared demonstration and who led it. The request was overruled. Exceptions were preserved to the refusal to discharge the jury or in its presence to determine who was responsible for the demonstration.

A number of affidavits from counsel and spectators were filed detailing the extent and character of the

demonstration. They add little to the brief statement made above, except that an aisle had to be cleared before the jury could be taken out and that the jury was taken out in single file. No further demonstration was made.

This occurrence is attacked in the motion for a new trial and is covered by one of the points in appellant's brief, in which he alleges that the demonstration was such as to influence the jury and prejudice them against him and that the court erred in refusing to discharge the jury, in refusing to investigate and punish the offenders as requested by counsel for defendant, in assuring the jury that it was not a planned demonstration, but a spontaneous outburst, in not charging the jury that they must disregard the demonstration, and in failing to clear the courtroom and in allowing the jury to come in contact with the mob.

In support of this contention appellant cites State v. Rasco, 239 Mo. 535; State v. Dusenberry, 112 Mo. l. c. 293; State v. Gartrell, 171 Mo. l. c. 513. It appears in the Rasco Case that at the conclusion of the closing speech of the prosecution the audience in the courtroom applauded. The opinion recites the following occurrence:

"By the Court: We can't have any of that in here.

"By the Sheriff: Quiet! Quiet!

"By the Court: That is a very serious offense, very; unpardonable. The jury will disregard any such manifestations. It is very offensive and very inappropriate. Go on."

In passing on the question, Ferris, J., said: "No objection was made by the defendant to the court's action in the matter. We do not see what more could have been done by the court. This demonstration could not have been anticipated. Nor may we assume that the jury would permit this show of popular feeling to sway them in their fidelity to their oaths to decide the case solely upon the evidence and the instructions of the court."

In the Dusenberry Case it appears that during the closing argument for the State there was a demonstration of applause, whereupon the court ordered the sheriff to arrest the offending parties, if he knew who they were. The attorney for the State denounced the applause as infamous. Thomas, J., said: ''The court, it seems to us, performed its duty fully. But besides this, the jurors were instructed 'that they ought to determine this case solely from the evidence adduced in the case; and, in arriving at a conclusion as to whether the defendant is guilty or innocent of the offense charged in the indictment, they should not suffer their minds to be influenced by the prejudice which men naturally entertain against the offense charged; but, before they can find the defendant guilty, their minds should be convinced beyond a reasonable doubt solely by the testimony in the case.' We cannot perceive how the court and counsel could have done more to neutralize the effect, if any, of the remarks and applause of the bystanders.''

In the Gartrell Case at the conclusion of the final argument to the jury the audience began to applaud with their feet. At the first sound the court ordered the sheriff to arrest any person guilty of such conduct, and being informed that the sheriff was unable to tell who was responsible, the court rebuked such conduct and commented upon the impropriety of such acts in a courtroom. Gantt, P. J., said:

''These facts do not show any dereliction on the part of either the judge or the sheriff. It is not pretended that either had any intimation that there were persons present who would show their approbation of Mr. Clark's speech by stamping, and it is clear that it was promptly checked and rebuked. The facts before us readily distinguish this case from those in State v. Woolfolk, 81 Ga. 558, and Cartwright v. State, 16 Tex. App. 473, 49 Amer. Rep. 826. In each of those cases the audience applauded the opening address for the State, and the trial court administered no reprimand, and then when the concluding argument in the Woolfolk Case was made,

'from the crowd in the rear of the courtroom came in an excited and angry tone the cry, "Hang him; hang him," and some of the crowd rose to their feet.' The court then rapped with his gavel and ordered the persons removed, but certified he did not know whether his order was obeyed. The court found other reversible errors in the record, but added that it granted a new trial with less reluctance because of this conduct of the crowd, and the failure of the court to properly rebuke such acts. SIMMONS, C. J., eloquently defined the duty of the trial court. He said: 'We think the judge should have stopped the argument of the State's counsel then and there and ascertained the guilty parties, and punished them to the extent of the law. He should have taught them that the law was supreme; that the trial of a man for his life, however heinous the crime charged against him might be, was a serious and solemn thing, and that the law would not permit a mob to interfere, either by applause or by threatening and exciting cries. By so doing he would have upheld the supremacy of the law, and would have shown the jury that whatever verdict they might find, the law would protect them. It would also have shown them that the court was uninfluenced by the feelings or demonstrations of the crowd; that it was still able to administer justice and to give the accused a fair and impartial trial. It would have given them a moral support, and would have tended to impress upon them the necessity of resisting such influences.' To substantially the same effect is the language of Judge WILSON in Cartwright v. State, supra.

"To all of which we give our hearty assent and cordial concurrence; but we think a statement of the facts shows a radical difference between the occurrence at this trial and those upon which those opinions are based.

"In this case no disorder or misconduct had occurred throughout the trial, and it was only after the last words of the prosecuting counsel had been uttered, that some of the crowd began to applaud with their feet.

''The record shows that instantly the trial judge interfered, ordered his sheriff to arrest the offenders, and then sternly rebuked such conduct. What the *nisi prius* judge failed to do in the Woolfolk and Cartwright cases, he did. Surely the jury were at once advised that such conduct was reprehensible in the extreme, and that they were not to be influenced thereby, and we cannot well see what more the court could have done. We think that the verdict should not be set aside for this momentary applause where no reflection can be made upon the court, counsel or jury and where no amount of vigilance would have prevented the occurrence.''

We think this case comes within the rule announced in the foregoing cases. Such occurrences are always deplorable and if the trial judge has any intimation that the audience is disposed to show its partisanship, he should anticipate the occurrence and warn them against such outbreak. It appears from the record that this was done. The trial judge was in a position to know better than anyone else whether the outbreak was spontaneous. Counsel for the defendant and for the State both disclaim any knowledge on their part that any demonstration had been planned, and we think the trial court was justified in holding that it was a spontaneous outburst. Manifestly, the trial court could not undertake in the presence of the jury to determine who was responsible for the demonstration and a delay for that purpose would have unduly emphasized the importance of the occurrence. No such investigation made after the jury retired could possibly have had the effect on the jury of neutralizing the harm done by the demonstration, if any. The trial judge heard the extent of the demonstration and knew what portion of the audience had engaged therein and did not err in failing to clear the entire courtroom in order to impress upon the jury the enormity of the offense. He did instruct the jury and inquired of them whether they could disregard this and not be influenced by the demonstration and render a fair and honest verdict as they should answer to their country and their God. It is hard to see

how any more solemn admonition could be given to the jury to disregard the demonstration than this inquiry appealing to their conscience. The record shows that the court required the jury to answer by sign and word that they would decide according to the law and the evidence.

So long as defendants charged with the commission of criminal offenses are accorded public trials, it is impossible to prevent spontaneous outbursts coming from spectators. Trial courts should be careful not to permit the crowding of courtrooms during the progress of trials of this character where feeling runs high. While the public is entitled to admission during the sessions of court, this does not mean that the trial court is helpless to prevent overcrowding by limiting the attendance in a reasonable and impartial manner. This should be done in self-protection by the court and to prevent this sort of outbursts. We think the trial court did everything that could reasonably be expected to offset the effect of the demonstration.

There is nothing in the verdict of guilty of murder in the second degree and assessing the punishment at thirty years in the penitentiary that tends to show passion and prejudice. If the jury believed the testimony of the State's witnesses, most of whom were disinterested and who greatly outnumbered the eye witnesses for the defense, the verdict bespeaks moderation and a commendable spirit of fairness and justice and excludes the idea that the jury was influenced against the defendant by reason of the demonstration made by spectators. We rule the assignment against appellant.

Grounds of error urged in the motion in arrest, other than the sufficiency of the information, have either been discussed in the opinion or apparently have been abandoned because not briefed by counsel. We have carefully read the entire record and have sought to consider carefully each and every assignment of error raised in motions for new trial and in arrest and have reached the conclusion that appellant was accorded a fair and im-

partial trial and was convicted upon substantial testimony and that there is no evidence of bias or prejudice on the part of the jury against him.

The judgment of the trial court should be and it is affirmed. All concur.